John T. Fletcher and Patricia G. Fletcher v. Commissioner. Robert J. Fletcher and Jacklyn W. Fletcher v. Commissioner.
Fletcher v. Commissioner
Docket Nos. 370-64, 371-64.
United States Tax Court
T.C. Memo 1965-273; 1965 Tax Ct. Memo LEXIS 58; 24 T.C.M. (CCH) 1489; T.C.M. (RIA) 65273; October 12, 1965
Joseph H. Trethewey and Lewis Guterson, for the petitioners. Walter John Howard, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in the income taxes of petitioners: Petitioners
Docket No.
Taxable Year
Deficiency
John T. Fletcher and Patricia G. Fletcher
370-64
1960
$443.51
1961
457.49
Robert J. Fletcher and Jacklyn W. Fletcher
371-64
1959
338.17
1960
558.01
1961
636.87
Some of the adjustments made by respondent are not contested by petitioners. The issues remaining for our decision are: 1. Whether any portion of the annual payments on a contract of purchase of an insurance agency business *59 may be deducted by petitioners as representing amortization' of a convenant not to compete contained in the contract. 2. Whether the insurance expirations acquired by petitioners in the purchase of an insurance agency business is a wasting asset subject to an allowance for amortization or depreciation. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners John T. Fletcher (hereinafter sometimes referred to as John) and Patricia G. Fletcher, and Robert J. Fletcher (hereinafter sometimes referred to as Robert) and Jacklyn W. Fletcher, were husband and wife, respectively, during the years here in question and filed their joint Federal income tax returns for those years with the district director of internal revenue at Tacoma, Washington. (John and Robert will hereinafter sometimes be referred to collectively as petitioners.) Patricia G. Fletcher and Jacklyn W. Fletcher are parties to this proceeding solely because they filed joint income tax returns with their husbands. Robert operated the Fletcher Insurance Agency as a sole proprietorship prior *60 to 1959. In 1959 John was an employee of his brother Robert. On or about January 1, 1960, John and Robert formed a partnership under the name of Fletcher Insurance Agency. On Line 6 of Schedule C attached to his income tax return for 1959, John deducted the amount of $1,780 which he explained as "Payment for Insurance Business Bought." Attached to John's and Robert's respective returns for the year 1960 are identical Schedule C's reflecting an equal division of the net profit from the Fletcher Insurance Agency. On line 6 of each Schedule C, John and Robert deducted the amount of $4,400, explained as "Ins. renewal costs." Petitioners filed a partnership return for the calendar year 1961, reporting net income of $16,205.68 from the Fletcher Insurance Agency. On this return there was deducted the amount of $4,400, explained as "renewal cost." On June 17, 1959, Northwestern Mutual Insurance Company (hereinafter sometimes referred to as Northwestern) and John and Robert entered into a "Bill of Sale and Agreement" with Victor H. White (hereinafter sometimes referred to as White) whereby White sold his insurance agency business to Northwestern for $25,000, of which $22,500 was paid by *61 Northwestern and $2,500 was paid by John and Robert. The instrument reads, in part, as follows: such insurance business including but not being limited to the expiration and renewal rights and values of all policies of the said insurance business, daily reports on all such policies and business, all records pertaining to the same, the exclusive right heneforth to solicit renewals of such policies, and to solicit additional business from the insureds under such policies, and the good will of said insurance business, but not including accounts outstanding or commissions on insurance business effective before August 1, 1959. The undersigned further agrees: (1) To relinquish all right and claim to subsequent renewals, additional premiums, or commissions on all of such insurance business, except contingent commissions accruing under agreement with General Insurance Company of America. (2) Not to disturb or attempt to secure the discontinuance of or solicit the replacement or renewal of any of said business. (3) Not to divulge, directly or indirectly, to any person any information with respect to the said insurance business. (4) Not to engage in the insurance business in any *62 capacity within King County, Washington, for a period of five years as a competitor of Northwestern Mutual Insurance Company or of Robert J. Fletcher or John T. Fletcher, without the consent of the said Northwestern Mutual Insurance Company or the said Robert J. Fletcher or John T. Fletcher. Another document, labeled "Agreement," was executed by John, Robert, and White on the sale date, identifying White as "seller" and petitioners as "buyers." This latter document incorporated into its terms two documents: the "Bill of Sale and Agreement" (referred to above); and an agreement entitled "Purchase Agreement," dated July 1, 1959, wherein John and Robert, doing business as Fletcher Insurance Agency, purchased White's insurance agency business from Northwestern, including the expiration rights of all policies in force, all customer lists, prospect files, daily reports, other records of every description and the goodwill of the agency. There was no office equipment or furniture involved in the sale. From February of 1929 until the sale of his business in 1959, White was an independent insurance agent doing business under his own name and selling insurance for General Insurance Company, *63 Hartford Insurance Company, and Northwestern. During these years he also wrote a number of storiees which he successfully sold to magazines. White was 60 years of age at the time he sold his business to Northwestern in 1959. The insurance agency business operated by White included fire, inland marine, and automobile casualty policies. Forty percent of his business, consisting of policies on apartment houses, White had developed through his personal knowledge of persons who owned apartment houses. White had been instrumental in the formation of an apartment house association and was closely connected with it for a number of years. He did not engage in selling life insurance. Ken Sorrels (hereinafter referred to as Sorrels), a special agent for Northwestern in 1959, had been White's contact with Northwestern. (A special agent is an employee of a given insurance company whose job is to call on independent insurance agents to promote the sale of his employer's insurance as opposed to that of another company.) Several years prior to 1959, White informed Sorrels of his desire to sell his insurance agency business. From the beginning, his asking price for his business was $25,000 and *64 he so informed Sorrels. White computed the price by a formula of one and one-half times his annual commission income. This formula is traditionally used in the insurance industry to determine the value of an insurance agency. Sorrels brought this opportunity to the attention of petitioners and brought the parties together to finalize the sale. White negotiated the sale with Sorrels up until execution of the agreement. Northwestern confirmed White's asking price of $25,000 by auditing his books of account in 1959. Although White never discussed terms or price arrangements with the petitioners, he learned that they were the ultimate purchasers from Northwestern prior to the actual sale. White was informed several days prior to the date the agreement was executed that petitioners had agreed to the $25,000 price. At some time during the negotiations, petitioners specifically requested a covenant not to compete and White agreed. Present at the time the final agreement was signed were petitioners, White, a lawyer from Northwestern, a lawyer for petitioners, and a stenographer. White was not represented by counsel during the final negotiations for the sale of his business or at the time *65 the sale and purchase documents were signed by the parties involved. There were no separate negotiations, or consideration stated, for the covenants not to compete, not to solicit, and not to divulge information. In 1959 it was customary practice to include a covenant not to compete in contracts selling independent insurance agencies without allocating a value to such covenant. The covenant not to compete was necessary to prevent White from soliciting his old accounts subsequent to the sale since he would already know the names and requirements of all his old customers. Petitioners considered that both White's covenant not to compete and the conveyance of his daily records and books of account were necessary to the purchase transaction. Petitioners would not have purchased White's business without his covenant not to compete, nor is it likely that an insurance company would have financed the sale without the presence of a covenant not to compete. Although the covenant not to compete only ran to King County (in which Seattle is located), 10 percent or more of White's business extended beyond King County. White reported the sale of his insurance agency business as a capital gain on *66 his income tax return. The return was examined by a revenue agent and this examination was still pending at the time of the hearing in this matter, March 22 and 23, 1965. Simultaneous to White's sale of his business to Northwestern, the business was conveyed to the petitioners, Northwestern acting as the lender. In purchasing White's business, John and Robert acquired his records, including billing books, which comprise a list of 687 accounts with names, coverage, expiration dates of policies sold and premiums, daily reports for policies in force and miscellaneous correspondence relating to the policies. The billing books contained carbon copies of the bills mailed to the customers. White conveyed two sets of these billing books to petitioners. These two books duplicated each other, containing a listing of all White's accounts. One of the books was White's expiration record which was filed chronologically by date of policy expirations. The other book was his account record and was filed alphabetically by name. The third set of duplicates of the original bills, the only set that showed what payments were made and on what dates, was not part of the transaction. White's reputation *67 in the insurance business was excellent and he was well respected in the community. He knew all his clients personally but did not ordinarily associate with them socially or send them greeting cards on special occasions. White agreed to the use of his name by the Fletcher Insurance Agency as part of the sale of his business but requested that petitioners cease using his name as soon as possible. However, he did not want to be liable for the use of his name by petitioners so he insisted on the inclusion of a "hold harmless clause" in the purchase contract. White's business telephone was turned over to petitioners who also caused a business listing under the name of "White Victor Insurance Agency" in the classified section of each Seattle telephone directory, through the directory of March 1963. This was necessary so that White's customers, who only had his name and telephone number, would be able to reach petitioners. The listing was withdrawn and the telephone number relinquished as soon as all the policies of his customers had been rewritten or their business lost. For the same reason, White's name was placed on the door of the Fletcher Insurance Agency and on the building directory *68 in which the agency was located. His name remained on the door until sometime in 1963 and was still on the building directory at the time of trial. For between 1 and 2 years petitioners used his name on the medallian sticker of the Fletcher Insurance Agency, which was affixed to renewed policies. This was done as a stopgap measure because some of his customers' policies were renewed by mail before petitioners had a chance to meet them. Also, for the same reason, petitioners used White's name on their stationery and billing sheets during the transition period in which White's business was being merged into that of petitioners. As soon as they could, petitioners personally contacted each one of White's customers in an effort to retain their business. Petitioners never intended to use the White name beyond the transition period and his name was eventually removed from all of the records and replaced with the Fletcher name. Prior to the purchase of White's business, petitioners' insurance agency was operated on a modern, direct billing method. Direct billing means that the insurance company itself sends bills directly to the purchaser and the purchaser pays the insurance company directly. *69 The Fletcher Insurance Agency, prior to the purchase of the Victor White Agency, sold what is known as a "package policy," which generally can be described as a policy combining a number of risks such as house, furniture, and personal liability into one policy. The "package policy" was an innovation in the insurance business which was introduced in the years immediately preceding 1959. At the time of its purchase, the Victor White Agency was not a "modernized" agency in that it had not generally converted its policies to the package type of insurance nor its billing to a direct bill basis. Consequently, it required more than normal mechanical effort to integrate White's business into that of petitioners because it was necessary, in most instances, to rewrite each entire account no later than the first renewal date which arose after petitioners took over. White wrote a letter for petitioners which they mimeographed and mailed to his former customers. This letter read, in part, as follows: I have done all my own typing, billing and bookkeeping. I am sure many of you recall those days when my wife and I took telephone calls at home evenings as well as office hours and weekends, *70 and we thus tried to render a superior service a little above the average in personal conscientious usefulness to our customers. * * *
My business has grown and expanded. It has finally reached a point where it is manifestly impossible for me to answer all calls personally, make out all bills and do all bookkeeping as well as take care of the increasing amount of detail in the business. I shall continue to do all I can. For some three years I have looked for the right kind of people to share the responsibility that I am necessarily forced to relinquish. I have been fortunate in becoming associated with the Fletcher Brothers, Bob and Jack, at a new office location, 501 Lyon Building. The telephone will remain the same, MUtual 2-1642. I may not always be in when you call because part of the purpose of this arrangement is to allow me more time to render service on the outside. If I am not here one of the Fletcher Boys will tend to the business for me. I feel you may have complete confidence in either of them. They are young men in their thirties and have each already had rather remarkable experience in our business. But, in any case of emergency, you may be sure that I may *71 be called upon to guarantee complete justice and fair dealing to the full extent of my influence as always. This letter was mailed to White's customers to assist petitioners in retaining the business of the White agency until they had an opportunity to meet his clientele. However, this was the only personal effort White made in this direction. White also wrote letters to the insurance companies he dealt with, transferring his ownership of all records in the possession of the respective companies and advising that all future correspondence with regard to this former business should be directed to the Fletcher Insurance Agency. White has lived in California continuously since November of 1959, a few months after the sale of his business. He has made occasional visits to the Seattle area where he owns some property but has sold no insurance since July 1959. However, he has at all times remained a legal resident of the State of Washington and voted in Washington by absentee ballot. Opinion As to the first issue, petitioners contend that the covenant not to compete was specifically bargained for although no specific consideration was assigned to it. They further contend that *72 no goodwill was transferred in the sale of White's insurance expirations to them because there was no continuity of business or identity carried over from White's agency to petitioners' agency; that they did not continue the use of the White name, office, or any other element evidencing goodwill; that they were required to modernize the White agency; and that White did not in any way attempt to transfer his personal relationship with his customers to them. Finally, petitioners argue that there was no going concern value in the nature of goodwill inherent in the purchase of the Victor White business. Respondent maintains that the covenant not to compete was included in the Bill of Sale and Agreement so that petitioners could enjoy the benefits of the acquired goodwill of a going business. Respondent also takes the position that since the covenant was not independently valued in the sale negotiations or assigned a value in the documents consummating the sale, it is not severable from the purchased goodwill. The sum and substance of petitioners' argument is that no goodwill was transferred, that White's covenant not to compete was the essence of the entire transaction, and that the *73 entire $25,000 purchase price is allocable to the covenant and thus amortizable. Alternatively, petitioners argue that any portion of the purchase price found not allocable to the covenant not to compete should be allocated to the insurance expirations and treated as a depreciable asset. To the contrary, respondent maintains that goodwill was the primary asset transferred to petitioners, that the covenant not to compete was an integral nonseverable part of the transferred goodwill and, therefore, none of petitioners' payments are amortizable. The issue is factual. , affd. (C.A. 4, 1960), certiorari denied . It is true that the failure of the parties to allocate in the contract part of the purchase price to a covenant not to compete is strong evidence that no allocation was in fact intended. (C.A. 9, 1962), affirming a Memorandum Opinion of this Court. However, at page 6 of the same case, *74 the Court of Appeals said: The fact that a preliminary purchase price had been agreed upon before the parties began discussing restrictive covenants does not necessarily preclude such covenants from being of value; nor does it preclude the court from allocating a value - a portion of the total contract price - to such covenants when no specific allocation is made by the parties in the contract. [9] We think the reasoning of the court in , particularly at 356-357, here controls. When dealing with tax problems we are not always bound by the precise terms of a written agreement. It is our judicial responsibility to examine the circumstances in each case to determine the realities of the situation. . The incidence of taxation depends on substance not form. Tax consequences are not to be *75 determined solely by the mechanical means utilized to transfer legal title. (C.A. 10, 1954); ; (C.A. 10, 1950); and Carl L. Danielson, 51 (July 12, 1965). The failure of the contract to specifically allocate a definite amount as the value of the covenant is material but not dispositive of the issue. Thus, we must ascertain the true intent of the parties as far as tax consequences are concerned. It appears on the face of these contracts that petitioners received several kinds of property, among others, insurance expirations, goodwill, daily reports on all policies in existence, and covenants not to compete, solicit, and divulge information. If we had nothing but the contracts to consider, we would find ourselves constrained to agree with respondent that an allocation cannot be made here. . However, we have the substantially uncontradicted testimony of petitioners' three expert witnesses as to the substantial value of *76 the covenant not to compete and the doubtful existence of any goodwill that could have been transferred in the sale. [1] One of the witnesses was a regional manager for a large insurance company, the second was the manager of the Washington department of another large insurance company, and the third was a special agent for still another large insurance company. The general tenor of their testimony was that all that is really involved in the sale of an insurance agency is the list of expirations, which provides nothing more than a better than average opportunity to solicit the people on the list, and a covenant not to compete; and that the former is basically valueless without the latter. They also testified that they did not believe goodwill was involved in this sale, and that their companies, when involved in similar sales, looked to the ability of the purchaser rather than the reputation of the seller. *77 Petitioners assert that White could not and did not transfer his ability, his experience, and his personal acquaintanceship with his clients and that they did not purchase a going business. We agree that White could not have transferred his ability and experience. But the letter he wrote for petitioners to distribute to his clients and his agreement to the use of his name during the period of transition were attempts to transfer his acquaintanceship with these people to petitioners. To some degree this evidence is counterbalanced by proof that White made no other efforts to introduce John and Robert to his clients and apparently was not in the habit of making close friends of his clientele. The same evidence also points toward an effort to forestall realization on the part of White's clients that his business had changed hands and that he was not continuing at the helm. However, petitioners did not take over White's office, but instead moved all his records to their own office so that there was no "place of business" to return to. Petitioners also informed White's clients of the situation as soon as they were able to meet them personally. Under these circumstances we find it difficult *78 to believe that all or most of the purchase price can be attributed to goodwill, although undoubtedly at least a small part of its was for the purchase of goodwill. We regard the covenant not to compete as having substantial value. This view is supported by the testimony of petitioners' three expert witnesses that not only are expirations generally all but valueless without the protection of a covenant not to compete, but also that their respective companies would not finance the sale of an insurance agency without such a covenant. Clearly, petitioners' testimony that they would not have consummated the purchase without the covenant not to compete has a "relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." (C.A. 9, 1961), affirming . Also see (C.A. 3, 1963), affirming a Memorandum Opinion of this Court, and Such testimony is completely tenable. See ; ; *79 and (C.A. 5, 1964), affirming in part and reversing in part . Respondent attempted to adduce evidence to the effect that White was elderly, in poor health, and had told everyone he could not wait to get out of the insurance business, move to California and concentrate on his writing. However, we have only White's self-serving testimony which is somewhat vague and inconsistent. There is no proof that petitioners were aware of White's avowed intentions and we doubt whether at age 60 he was, or really believed that he was, anywhere near the end of his useful working years. Without the covenant not to compete petitioners would have had no guarantee that White would not come back to Seattle and solicit his old clients if he found that his writing activities did not produce sufficient income for his livelihood. One of petitioners' experts stated that his company would require a covenant not to compete regardless of the protestations of the seller as to his future plans. Although the covenant not to compete did not extend beyond the boundaries of King County, and approximately 10 percent of White's business *80 was outside that county, the covenants not to solicit business and not to divulge information did pertain to the King County business and amply protected it. In the absence of a specific allocation to a noncompete covenant, the courts have been reluctant to determine a value for the covenant where it is "so closely related to a sale of goodwill that it fails to have any independent significance apart from merely assuring the effective transfer of that goodwill." (C.A. 2, 1959), affirming . But, since this is evidentiary, an allocation can and should be made when there is proof sufficient for a court to determine relative values. In our opinion the facts here establish that the covenant not to compete has substantial independent significance and amply meets the threshold tests of genuineness and economic reality. . Finally, we believe the insurance expirations likewise have substantial value. While it is true that the expirations would be valueless *81 without the covenant not to compete, it is equally true that the covenant would be valueless without the expirations. Having concluded that the covenant and the expirations were of substantial value and that whatever goodwill transferred was of minimal value, we must decide what portions of the total purchase price are allocable to the covenant, the expirations, and the goodwill. See Levine v. Commissioner, where the Court said (): In the face of this record we cannot accept the propositions that the amounts fixed by the court have no evidential warrant and are no more than speculation. The Tax Court in its judgment did not accept in full the total presented either by the sellers or the buyer for the good will and covenant respectively. It did agree that both items were valuable. In those circumstances to allow nothing for good will or for the covenant or for both would have been at least inconsistent. At the same time one hundred per cent accuracy in fixing the amounts is impossible. So the court made the closest approximation it could. See (2 Cir. 1930). The record supports an approximate *82 allocation by applying the principle announced in (C.A. 2, 1930). After considering all the facts contained in this record relevant to such allocation, and applying our own best judgment, we hold that 45 percent of the total purchase price should be allocated to the covenant not to compete, that 45 percent thereof should be allocated to the insurance expirations, and that 10 percent should be allocated to goodwill. As to the second issue, petitioners maintain that insurance expirations represent a valuable property right, that they have carried their burden of proving that the expirations they acquired have a determinable useful life, and that they are therefore entitled to amortize that portion of the total purchase price of White's business allocated to the expirations over the life of such expirations. Respondent does not dispute that the insurance expirations represent a valuable property right but contends that they do not represent a wasting asset subject to depreciation or amortization. His position is that the list of accounts with insurance expiration information constitutes one asset, consisting largely of goodwill, *83 and composed of names of customers who purchased insurance policies that had not expired when the petitioners acquired White's business. The problem, as presented to us, is basically factual. The classic definition of insurance expirations was set forth in V. (C.A. 4, 1952), as follows: "Expirations" in the insurance field has a definite and well recognized meaning; it embodies the records of an insurance agency by which the agent had available a copy of the policy issued to the insured or records containing the date of insurance policy, the name of the insured, the date of its expiration, the amount of insurance, premiums, property covered and terms of insurance. This information enables the agent to contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements. It has been determined that this information is of vital assistance to the agency in carrying on the insurance business *84 and it has become, in the insurance field, recognized as a valuable asset in the nature of good will. Although not a tax case, the Court's analogy of insurance expirations to goodwill has been almost universally adopted by the courts in tax cases involving expirations. The characterization of insurance expirations as an asset in the nature of goodwill is reasonable because under ordinary circumstances expirations, like goodwill, have an indeterminate useful life. Without equating insurance expirations with goodwill, our point is that both types of assets have at least one common characteristic, viz., indefinite useful life. The rules dealing with the depreciation of intangible property are set forth in the Income Tax Regulations as follows: § 1.167(a)-3 Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. *85 An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. Petitioners, through their own testimony and that of their expert witnesses, have attempted to prove that the insurance expirations they purchased had a maximum useful life of 5 years. However, an analysis of the testimony shows that it was all based on the same basic premise; i.e., the maximum period (5 years) for which White wrote insurance. Petitioners argue that the list of 687 names purchased from White never increased but rather that its utility decreased in readily measurable degrees as the policies were renewed or the business lost. This argument completely ignores the addition to the life and value of this list generated by referrals from White's old customers. Petitioners adduced no evidence as to referrals but obviously hoped, at the time of purchase, to realize substantial business from this source. Certainly these referrals were and are benefits arising *86 from the original customer list. Petitioners introduced evidence to the effect that at the end of 5 years after the sale they had lost 59.9 percent of the business of White's old customers. This was offered to support their contention that approximately 20 to 30 percent of the business of an insurance agency is lost in the year immediately following its sale and that subsequent to that year there is a "normal" attrition of approximately 10 percent. However, this evidence serves to reinforce our disagreement with petitioners' claim that the expirations have a 5-year life because at the end of 5 years they still had 40.1 percent of White's original business, without taking into account the referrals that undoubtedly resulted from that business. The fallacy of petitioners' argument is patent. They are under the misconception that after the expiration information has been used for the first time it becomes valuless, whether there is a renewal or the business is lost. Apparently they believe that once a policy was renewed the expiration information was no longer part of the list purchased from White but somehow became merged in their own business. Such is not the case. The benefits *87 inuring to petitioners from White's customer list, whether in the nature of renewals or referrals, remain attributable to that list. The expiration information is useful at each renewal, not just the first. Thus, it is plain to us that an insurance expiration list, purchased together with goodwill and a covenant not to compete, does not have a determinable useful life. The parties have cited a number of cases which we have read and considered. While some of them have facts in common with the issues before us, none involve facts substantially similar to those at hand. Decisions will be entered under Rule 50. Footnotes
9. As was so well stated by Judge Learned Hand in : The one sure way to do injustice in such cases is to allow nothing whatever upon the excuse that we cannot tell how much to allow.↩
1. Of course White testified that there was substantial goodwill transferred to petitioners. However, since he is interested in the outcome of this matter, we do not give substantial weight to his testimony which was so strongly controverted by petitioners and by their three well-qualified expert witnesses. We also note that respondent's counsel put an expert witness on the stand who was qualified to testify as to the goodwill and covenants involved in the sale of an insurance agency but chose not to question him about such matters.↩