**SUPER FOOD SERVICES, INC.,**
**Plaintiff-Appellant,**

**v.**

**UNITED STATES of America,**
**Defendant-Appellee.**

**No. 17254.**

United States Court of Appeals
Seventh Circuit.

July 28, 1969.

On Plaintiff's Bill of Costs
Sept. 10, 1969.

Charles W. Davis, John L. Snyder, William L. Heubaum, Chicago, Ill., Samuel H. Horne, Washington, D. C., for plaintiff-appellant; Hopkins, Sutter, Owen, Mulroy, Wentz & Davis, Washington, D. C., of counsel.

Thomas A. Foran, U. S. Atty., Chicago, Ill., Johnnie M. Walters, Asst. Atty. Gen., Bennet N. Hollander, Lee A. Jackson, Jonathan S. Cohen, Attys., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before MAJOR, Senior Circuit Judge, KILEY and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This is an appeal from a summary judgment denying certain depreciation and loss deductions in connection with retail grocery store franchise contracts acquired by taxpayer.

Taxpayer, Super Food Services, Inc., is a Delaware corporation, with its principal place of business in Chicago. It kept its books and records and filed its income tax returns on the basis of a fiscal year ending on August 31. The taxable year in controversy ended August 31, 1960.

During that taxable year, plaintiff operated four divisions covering various territories in the United States. In those territories, it holds exclusive Independent Grocers Alliance Distributing Company ("IGA") wholesale franchise contracts. Under those contracts, it licenses independently-owned retail grocery stores to sell IGA merchandise, use the IGA name and operate under IGA merchandising, advertising and promotional programs. Taxpayer pays IGA a monthly fee for its services and receives a fee from each associated retail store based on gross sales. Taxpayer sells groceries at wholesale to the IGA stores that it franchises. Its earnings are derived from those wholesale grocery operations and from the fees paid by its licensees.

The present controversy concerns the taxpayer's F. N. Johnson Division which operates in 39 counties in Ohio. Taxpayer acquired this division in 1959 by purchasing the capital stock of the F. N. Johnson Company for $3,025,000. On August 31, 1959, the Johnson company was liquidated pursuant to Section 332 of the Internal Revenue Code (26 U.S.C. § 332), and all its assets distributed to taxpayer. $1,905,641 of the purchase price was allocated to the tangible assets, $17,978 was allocated to goodwill, and

$1,101,381 was allocated to 184 of the retail franchise contracts Johnson had with IGA retailers. A value was assigned to each contract in accordance with a formula discussed below. No value was allocated to 23 of Johnson's retail franchise contracts which had been in existence for less than twelve months, nor was any value allocated to the exclusive IGA wholesale franchise contract that Johnson had acquired in 1927. All the retail franchise contracts were terminable by either party upon 30 days' notice.

For the taxable year ending August 31, 1960, plaintiff claimed a deduction of $121,832 for depreciation of 184 of the 207 retail contracts acquired from Johnson, together with a loss of $29,199 for retail contracts that terminated during that year. The Internal Revenue Service disallowed both deductions and plaintiff paid the deficiency asserted. After taxpayer's subsequent refund claim was disallowed, it filed a complaint in the district court seeking a refund of $93,939.50 on income taxes paid for that taxable year, together with interest. This amount was based on taxpayer's claim that it was entitled to a deduction of $149,263.88 for depreciation of the 184 retail franchise contracts and $31,389 for loss on contracts terminated during the taxable year. The district court granted the Government's motion for summary judgment, holding that taxpayer was not entitled to either the depreciation or loss deduction. The taxpayer has asked us to direct the district court to enter summary judgment for it or to proceed to trial of this case. We have concluded that summary judgment was improperly granted and that the case should be remanded for trial.

*Depreciation of Retail Franchise Contracts*

As to 184 of the retail franchise contracts acquired in 1959, taxpayer asserts that it is entitled to a depreciation deduction under Section 167(a) of the Internal Revenue Code (26 U.S.C. § 167 (a)), which provides:

"There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business."

The applicable regulation provides:

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to good will. * * *." (Treasury Regulation § 1.167(a)–3.)

The prerequisites to a depreciation deduction for an intangible asset are (1) that the asset be shown to have a limited useful life and (2) that its length be able to be estimated "with reasonable accuracy." A "reasonable certainty" or "reasonable approximation" of the fact and rate of depreciation or exhaustion is sufficient. Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 654–655, 51 S.Ct. 262, 75 L.Ed. 594. It is also settled that contracts with limited useful lives, like other business intangibles, may be the proper subject of a depreciation deduction.[1] Nor is the useful life necessarily limited to the stated duration or termination period "when taxpayer can demonstrate, as he did here, that the contract will be extended over a longer period of time." Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 653 (9th Cir. 1966).

---

1. See Note, "Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill," 81 Harv.L.Rev. 859, note 7 (1968).

Franchise contracts are no exception (4 Mertens Law of Federal Income Taxation § 23.10, at p. 33 (rev. ed. 1966)) even though there may be uncertainty in determining their expected duration. Cf. Northern Natural Gas Co. v. O'Malley, 277 F.2d 128, 135 (8th Cir. 1960). In order to sustain the district court's award of summary judgment to the Government, it must appear that as a matter of law based on undisputed facts one of the prerequisites to a depreciation deduction is absent in the present case.

The Government does not dispute, nor could it in defense of its summary judgment, that some of the 184 franchise contracts were terminated during the taxable year and are of no further value to the taxpayer. Moreover, in its brief the Government recognizes that the cancellation of any retail franchise contract reduces the value of taxpayer's business. It is argued, however, that the retail franchise contracts were purchased by taxpayer as part of an "indivisible asset" with lost contracts constantly being replaced by new ones, so that the asset viewed as a whole has an unlimited life akin to goodwill or customer structure. This mass asset doctrine has recently been subjected to strong criticism in Note, "Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill," 81 Harv.L.Rev. 859, 864–868 (1968), for the reason that the customer structure which may inhere in a group of purchased contracts only guarantees patronage for a limited period of time. In the present case it is clear that each retail franchise contract represents a distinct relationship between the taxpayer and a franchisee operating in a certain geographic area. The purchase of the franchise contract merely provides taxpayer an opportunity to attempt to maintain the relationship established by its predecessor. When, for example, through the pressure

of local competition, ill health, or dissatisfaction with the services provided under the contract, a franchisee terminates his relationship with taxpayer and IGA, the value of the purchased business is diminished. Only through taxpayer's own efforts in recruiting a new franchisee will that value be restored. While there may be some residual advantage in seeking new outlets by reason of the reputation of taxpayer's predecessor, this is a matter of goodwill and cannot be relied on to establish that new contracts should be considered merely part of an indivisible asset purchased from the former owner.

█ Even if we were to find the indivisible asset doctrine sound in theory, we would have no occasion to apply it to facts such as those presently before us where the taxpayer has made a reasonable showing that the contracts were valued individually at the time of the purchase decision. Seaboard Finance Co., 23 T.C.M. 1512, 1537 (1964), affirmed, 367 F.2d 646, 652–653 (9th Cir. 1966). The record reveals that at the time of the Johnson acquisition in 1959, counsel and personnel of taxpayer undertook an analysis of Johnson's experience with contract terminations in order to evaluate the existing contracts to determine a purchase price. Using all available figures, covering the period from 1947 to the date of purchase, some 486 contracts were studied, and it was determined that a contract which has been in force for more than 12 months had an average contract life of 86 months. An affidavit of Davis F. Roenisch, an actuary, confirmed that the contracts "display a definite and consistent pattern of termination" which would have been discernible as of the date of purchase. He further concluded that taxpayer's subsequent termination experience between 1959 and 1966 corroborated the pattern established prior to 1959.[2] For the purpose of demon-

---

2. Having established an average useful life for the franchise contracts, and after eliminating 23 contracts which had been in force less than 12 months and whose useful lives were therefore considered

unreliable, the taxpayer then placed a value on each of the remaining 184 contracts by allocating the total value represented by these contracts to each con-

strating that the franchise contracts do in fact have limited lives, we cannot say that this analysis of average useful life is inadequate. See Manhattan Co. of Virginia, Inc., 50 T.C. 78, appeal dismissed (4th Cir. 1968).

The fact that taxpayer's analysis of contract terminations was limited to the last 12 years prior to the Johnson acquisition does not support denial of all depreciation, particularly since 90% of the contracts studied went into effect after June 10, 1947, and were thus of known duration. Also, we find no objection to taxpayer's adducing evidence of its experience with contract terminations subsequent to the 1959 Johnson acquisition for the purpose of corroborating the estimate of useful life of the contracts based on the experience of Johnson prior to 1959. Cf. Mims Hotel Corp., 13 T.C. 901 (1949), affirmed on other grounds, 185 F.2d 55 (4th Cir. 1950). Taxpayer was not here attempting to use this subsequent experience to change the rate of depreciation which would have been appropriate in 1960. We conclude that the taxpayer has demonstrated that the franchise contracts do have a limited useful life and that summary judgment was improperly granted to the Government on this point.

The Government also attacks the reliability of taxpayer's attempted determination of the expected duration of the contracts. It argues that because the contracts were terminable at will on 30 days' notice, no estimate of their period of utility to the taxpayer's business is possible. However, neither the statute nor the regulations establish such an inflexible standard. The appropriate test is whether the particular taxpayer has adequately demonstrated that in his business the useful life of the challenged intangibles may be reasonably approximated. Burnet v. Niagara Falls Brew-

ing Co., 282 U.S. 648, 654–655, 51 S.Ct. 262, 75 L.Ed. 594. It is immaterial that the contracts may have no fixed termination date. Cf. Manhattan Co. of Virginia, Inc., 50 T.C. 78, 96, appeal dismissed (4th Cir. 1968); Vaaler Insurance, Inc. v. United States, 68–1 U.S.T.C. ¶ 9183 (D.N.D.1968); Johnson v. United States, 61–1 U.S.T.C. ¶ 9278 (W.D.Tex.1961). In our view, supported by the *Seaboard Finance* case, it is also immaterial whether these contracts were acquired separately or as part of a going business. Any quarrel with the going concern value of contracts acquired as part of a business is properly directed to the allocation to be made between goodwill and the contracts purchased and should not be relied on as requiring a complete denial of depreciation deduction to contracts shown to have a limited useful life.

■ The Government devotes a substantial portion of its brief to attacking the statistical reliability of the evidence presented by the taxpayer in support of its claimed 86-month useful life. It relies on our decision in Commissioner of Internal Revenue v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir. 1965), as authority for the proposition that statistics based on an industry's history of terminations will not suffice to provide a reasonably accurate estimation of the useful life of a renewable contract. There we held that certain television network affiliation contracts were not depreciable assets because the taxpayer's statistical analysis was inherently unreliable, for it unjustifiably employed the Poisson Exponential Theory of Failure [3] although the history of the television industry at that time precluded "any reliable norm of contract expectation" (at p. 585). Here the Government has introduced no evidence to rebut taxpayer's evidence of an 86-month life for these contracts. On the present state of

---

tract in proportion to the revenue produced. The Government attacks the total value ascribed to the contracts and the allocation of the purchase price between the wholesale franchise contract with IGA, the various retail franchise con-

tracts and the goodwill of Johnson. These disputed questions of fact can only be resolved at trial on the merits.

3. Under that theory, the percentage of failure of items to which it is applied is a constant (see 350 F.2d at pp. 582–583).

the record we cannot find that the Government has shown as a matter of law that the useful lives of the franchise contracts cannot be estimated with reasonable accuracy. Any dispute as to the underlying figures used by taxpayer, the method of calculation, or other factual determinations affecting the 86-month figure must be determined at trial.

*Deduction for Contracts Lost*

▮▮▮▮ Taxpayer also argues that it is entitled to a $31,389 deduction for the loss of franchise contracts that terminated during the taxable year. The deduction is claimed under Section 165(a) of the Internal Revenue Code (26 U.S.C. § 165(a)), providing that "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1.165–2(a) of the applicable Treasury Regulations provides:

> "A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained."

Under this regulation, the loss deduction does not depend on whether the retail franchise contracts are depreciable. The district court gave no reason for its refusal to allow the loss deduction, and the Government advances the same contentions rejected above in support of its disallowance of the proposed deduction for loss. If taxpayer can prove the cost of the contracts lost during the taxable year, it should be permitted to take a deduction under Section 165(a) of the Internal Revenue Code. Metropolitan Laundry Co. v. United States, 100 F. Supp. 803 (N.D.Cal.1951); Henry C.

Rowe, 19 B.T.A. 906 (1930), acquiesced, X–1 C.B. 56 (1931). Taxpayer should have an opportunity on remand [4] to prove that the duration of these lost contracts can be estimated with sufficient accuracy to determine the remaining value of contracts cancelled during the taxable year.

Reversed and remanded.

Opinion on Plaintiff's Bill of Costs

Before MAJOR, Senior Circuit Judge, KILEY and CUMMINGS, Circuit Judges.

PER CURIAM.

This matter arises on plaintiff's bill of costs, its supporting memorandum, and defendant's opposing memorandum. On July 28, 1969, this Court rendered its judgment reversing and remanding this cause.

Public Law 89–507, 80 Stat. 308 (July 18, 1966), amended Section 2412 of the Judicial Code (28 U.S.C. § 2412) to provide that costs might usually be recovered against the United States in civil actions. Section 3 of the Amendatory Act provides:

> "These amendments shall apply only to judgments entered in actions filed subsequent to the [July 18, 1966] date of enactment of this Act."

▮▮▮ Although 28 U.S.C. § 2412 refers only to "actions," it has been understood to apply to costs on appeal when such costs are otherwise authorized by law. See, *e. g.*, Coyle Lines, Inc. v. United States, 198 F.2d 195 (5th Cir. 1952). The Federal Rules of Appellate Procedure, Rule 39(b), incorporate by reference the provision of 28 U.S.C. § 2412 for purposes of determining when costs shall be taxable against the Government. Thus when the language of Section 2412 is sought to be interpreted as it applies to costs on appeal, the reference to "actions filed" should be read

---

4. Taxpayer did not waive its right to trial by its cross-motion for summary judgment. 6 Moore's Federal Practice ¶ 56.13 (2d ed. 1966) p. 2255.

to mean appeals filed after July 18, 1966. Therefore plaintiff-appellant is entitled to recover from the United States the costs of printing its briefs and appendix on appeal.