**MARSH & McLENNAN, INCORPO-
RATED, Appellant,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.**

**No. 17815.**

United States Court of Appeals
Third Circuit.

Argued Sept. 26, 1969.

Decided Dec. 31, 1969.

Van Dusen, Circuit Judge, dissent-
ed.

John F. Beggan, Gardner, Carton,
Douglas, Chilgren & Waud, Chicago, Ill.,
for appellant (James A. Velde, Gardner,
Carton, Douglas, Chilgren & Waud, Chi-
cago, Ill., on the brief).

Robert I. Waxman, Dept. of Justice,
Tax Division, Washington, D. C., for ap-
pellee (Johnnie M. Walters, Asst. Atty.
Gen., Lee A. Jackson, Gilbert E. An-
drews, Attys., Dept. of Justice, on the
brief).

Before HASTIE, Chief Judge, and
McLAUGHLIN and VAN DUSEN, Cir-
cuit Judges.

OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit
Judge.

This is an appeal from a decision of
the Tax Court of the United States as-
sessing deficiencies in the income tax
liabilities of appellant Marsh & Mc-
Lennan, Inc., a Pennsylvania corpora-
tion, of $1,783.22 and $7,246.27 for the
respective tax years, 1961 and 1962. 51
T.C. 56 (1968); C.C.H. Dec. 29, 190.[1]
Specifically, the Tax Court affirmed the
Commissioner's disallowance of certain
depreciation deductions made by taxpay-
er relating to the cost of acquired in-
surance expiration information.

Marsh & McLennan, Inc., a Delaware
corporation, the parent company of ap-
pellant, is engaged nationwide in the in-
surance brokerage business, serving
mainly large industrial and commercial
clients. Its clients include about half of
the 500 largest corporations in the Unit-
ed States, and in 1967 it earned commis-
sions totalling roughly $76 million.
Handling, as it does, primarily large-
risk business clients, the insurance writ-
ten by Marsh & McLennan is customized
to each client's needs unlike, for exam-
ple, standardized home owner or automo-
bile insurance policies; the coverage
which Marsh & McLennan writes is
placed with various domestic and for-
eign insurers.

The Marsh & McLennan organization
expanded rapidly, partly through acqui-
sitions of other brokerage firms, in the
decade 1957–67, and it currently has ap-
proximately 25 domestic subsidiaries
alone. Appellant, Marsh & McLennan,
Inc., the Pennsylvania corporation with

1. With respect to this Court's scope of
review in an appeal from a decision of the
Tax Court, the Congress has made it clear
that such decisions are to be reviewed
" * * * in the same manner and to the
same extent as (are) decisions of the
district courts in civil actions tried with-
out a jury * * *." 26 U.S.C.A. §
7482(a).

its principal place of business in Pittsburgh, is the successor corporation to Stokes, Packard & Smith, Inc., which it acquired in September 1961. Appellant purchased all of the assets of Stokes, Packard & Smith, Inc. for the sum of $265,383, and assumed Stokes' liabilities of $384,283.82. It received in exchange from Stokes, all property, including all of Stokes' insurance "expirations", to which a value of $69,550.78 was attributed. The sole issue before us is whether the Tax Court was correct in holding that the cost of those "expirations" was not depreciable.

The nature of the "expirations" is crucial to an understanding of the decision below. The Tax Court found that "insurance expirations" consist of:

"* * * the records of the firm, including copies of the insurance policies, showing the name of the insured, the amount and nature of the insurance coverage, the location of the risk, the policy expiration date, the premium, and other data concerning insurance carried by the client. Such insurance expirations aid * * * in obtaining renewals of the business of the acquired broker's accounts by supplying information pertinent to the insurance needs of the accounts, *and permitting it an advantage over competitors for the business by furnishing it an entree to the insured which would not otherwise be available.*" (Emphasis supplied.) 51 T.C. 56, 58,

Information of this nature is, of course, business confidential, and competition in the insurance brokerage business clearly is vigorous to say the least.

As indicated above, $69,550.78 of the total purchase price paid for the assets of the Stokes corporation represented the calculated value of certain of Stokes' insurance expirations; that sum was over and above the calculated net worth of Stokes. Because Marsh & McLennan was motivated to acquire Stokes by a desire to obtain the latter's five or six large commercial accounts (or clients) and the valuable "expirations" relating thereto, appellant contends, in effect, that the $69,550.78 was the acquisition cost of these five or six expirations, and that for tax purposes, it was entitled to depreciate this cost over the useful life of those five or six large-client related expirations under Subsection 167(a) of the Internal Revenue Code of 1954 (26 U.S.C.A. § 167(a)), and Section 1.167 (a)–3 of the Income Tax Regulations.[2] Section 1.167(a)–3 of the Regulations reads with respect to intangible business assets, in pertinent part, as follows:

"If an intangible asset is known from experience or other factors to be of use in the business * * * for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible may be the subject of a depreciation allowance * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * * No deduction for depreciation is allowable with respect to goodwill. * * *"

Relying on the Regulation, the Tax Court held:[3]

"[I]t is our conclusion that the expirations * * * *were so inextricably linked with goodwill* that they cannot be considered as having an existence separate therefrom." (Emphasis supplied.) 51 T.C. 56, 64.

2. Taxpayer claimed deductions, which the Commissioner disallowed, of $3,429.28 and $13,935.14 in its income tax returns for tax years 1961 and 1962, respectively, as depreciation of "Insurance Contracts Purchased," based on a cost of $69,550.78 over a five-year life.

3. The Tax Court also discredited Marsh & McLennan's alternative contention that if the expiration information was determined to be non-depreciable, nonetheless, a substantial portion of the purchase price should be amortized over the five-year terms of the covenants not to compete contained in the purchase agreement. However, Marsh & McLennan abandoned that theory on this appeal.

And,

"Moreover, even if it were considered that the $69,550.78 constituted a payment for the insurance expirations, separate and apart from the goodwill as such, we nevertheless would feel constrained to hold that the payment was for an asset *the useful life of which cannot be determined with reasonable accuracy* and that such payment cannot be amortized and deducted as depreciation." (Emphasis supplied.) 51 T.C. 56, 64.

We think that under the circumstances of this appeal, the views of the Tax Court are correct, and consistent with previous case-law.

With respect to the goodwill holding of the court below, we repeat that first of all the testimony established that the insurance brokerage business is strongly competitive. In that sort of tactic Marsh & McLennan—with its large organization and staff and nationwide chain of offices—had unsuccessfully attempted to obtain those Stokes' prime accounts. That led it to later buy out the Stokes concern and thus take over the desired accounts. As the Tax Court stated:

"These five or six accounts had been held by Stokes for a long time and the Marsh & McLennan organization had endeavored, without success, to acquire them by direct contact with the clients. The chairman of the board of directors of petitioner's parent testified that these large commercial accounts 'had a long association with Stokes and we just felt that this (acquisition) was a good way to buy our introduction'." 51 T.C. 56, 64.

For the first nine months following the purchase of Stokes, the letterheads used by Marsh & McLennan when it was corresponding with customers of the old Stokes business contained the statement that it was successor to Stokes, Packard and Smith, Inc. The sale agreement covering the Stokes transaction not only contained five-year covenants not to compete, restricting the selling Stokes' stockholders from servicing their old business clients,[4] but also a provision for the employment by Marsh & McLennan of Stokes selling stockholders. All of the latter accepted such employment as did most of Stokes' nonstockholder employees. Our review of the factual picture involved convinces us that the Tax Court was correct in its following analysis:

"We believe * * * that Stokes did have goodwill, and that the petitioner was interested in obtaining such goodwill even though it may have been primarily interested in the goodwill relating to only five or six of the largest commercial accounts." 51 T.C. 56, 64. (262(a).)

In Thoms, supra, at 256, which also dealt with the sale of an insurance business, the Tax Court concluded as follows:

"We are of the opinion that under the facts of this case the list of expirations is so inextricably linked with goodwill that it could not possibly have a separate depreciable existence. We have here the transfer of a going insurance agency business and its goodwill. Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the

4. If as appellant contends, the insurance expirations in and of themselves were the sole key to the accounts of the Stokes firm, the covenants not to compete which were exacted from the Stokes' stockholders would have been meaningless after the sale of the business for Marsh & McLennan then had the expiration information. But further, as the Tax Court found: "One of the conditions of the contract, inserted at the insistence of the petitioner, was that Stokes obtain such a covenant not to compete from a former stockholder and associate of Stokes." 51 T.C. n. 1. As was said in a similar situation in Thoms v. Commissioner of Internal Revenue, 50 T.C. 247, 255 (1968) : "It is obvious such a covenant (not to compete) has the function primarily of assuring the purchaser the beneficial enjoyment of the goodwill and the seller's list of expirations."

probabilities that old customers will continue their patronage. Surely goodwill in the insurance agency business encompasses the advantage that the agency has, that its policyholders will renew their expiring policies. It is difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the transferee. If the list is not given to the transferee of goodwill he receives no benefit in the form of a probability that the policyholders of the old business will renew with him, which is just another way of saying he did not get the goodwill. If the list is delivered to the transferee of goodwill it merely accomplishes the transfer of goodwill—defined to be the benefit that he will probably secure the renewals. The transfer of a list of expirations of a going insurance agency business is merely implementing the transfer of goodwill. * * * It is furnishing the transferee with records that will give him the opportunity to succeed to the advantageous position of his transferor. In our opinion the list of expirations is an integral part of the goodwill of a going insurance agency business." (Citations omitted.)

This principle was reaffirmed by the Tax Court in Morris v. Commissioner, 27 T.C.M. 1558, 1562 (1968) which there held:

"The established principle in this Court is that where a taxpayer purchases a going general insurance agency business or a part thereof, including the goodwill, the list of insurance expirations * * * are either a part of goodwill, which is not subject to depreciation, or are so inextricably linked with goodwill as to have an indefinite useful life and therefore not depreciable. See Alfred H. Thoms [Dec. 28,947], 50 T.C. 247 (1968);

Marsh & McLennan, Inc., [Dec. 29,-190], 51 T.C. 56 (1968) * * *"

In the Marsh & McLennan claim relied on by the Tax Court in Morris, supra, and now before us, although Marsh & McLennan may have been principally interested in the five or six large commercial accounts handled by Stokes, actually Stokes had about 2400 accounts, and except for some sub-brokerage business, it appears that Marsh & McLennan still enjoys the advantage of retaining most of Stokes' former customers. 51 T.C. 61, n. 2.

Appellant is likewise incorrect in urging that the Tax Court was wrong in rejecting its alternative contention that the useful life of the expirations in question could be determined with reasonable accuracy. Certainly once a potential customer was approached by Marsh & McLennan on the basis of the Stokes' expiration information and goodwill, the value of that first approach, or entree as the Tax Court put it, does not disappear just because Marsh & McLennan was able to persuade the former Stokes client to stay with the successor Marsh & McLennan operation. As long as the customer is with Marsh & McLennan, the customer relationship is still derivative of the initial situation as successor to Stokes; this conclusion is reaffirmed by the testimony discussed above indicating that Marsh & McLennan on its own was unable to draw the particular prime accounts away from Stokes. In this connection it is significant that the statistical evidence offered by Marsh & McLennan estimated that the useful life of the accounts in question would be 17 years. That evidence was not based on the said Stokes' accounts but rather on an *"analysis of a portion of the commercial accounts handled in 1950 by the Chicago office of the Marsh & McLennan organization"*.[5] We cannot say that the Tax Court was not free to disregard such evidence.[6]

---

5. Marsh & McLennan, 51 T.C. 56, 65. Emphasis supplied.

6. Super Food Services, Inc. v. United States, decided July 28, 1969 (69–2 U.S. T.C., par. 9558) heavily relied on by appellant does not change this result.

The decision of the Tax Court of the United States will be affirmed.

VAN DUSEN, Circuit Judge (dissenting).

I respectfully dissent.

The Tax Court concedes, in its reasoning in this case, that the expirations are intangible capital assets [1] capable of depreciation under § 167(a) of the Internal Revenue Code of 1954 and accompanying regulations. The Tax Court, however, disallowed all deductions claimed by the taxpayer because of two findings: first, the expirations were inextricably linked with elements of goodwill such that they had no determinable value in themselves; and second, the taxpayer had not proved that the expirations had a limited useful life, determinable with "reasonable accuracy." An examination of the record indicates to me that these findings were clearly erroneous. Also, it appears that, in part, they were based on erroneous conclusions of law.

As to the first finding, the Tax Court listed four elements that had been purchased along with the expirations, and to which it found the expirations were inextricably linked: (1) the 2400 noncommercial accounts, (2) the covenant not to compete, (3) the employment of former shareholders and employees of Stokes, together with their use in soliciting accounts, and (4) the use of the Stokes name for nine months on Marsh & McLennan stationery, indicating that Stokes was the predecessor of Marsh & McLennan.

There is evidence that these elements existed, but there is little, if any, evidence that any of the $69,500. premium involved in this case was paid for the purchase of these elements. Marsh & McLennan was interested in purchasing the expirations; that it also procured other elements to make its use of the expirations more effective does not weaken this conclusion. The Tax Court relies upon the testimony of the Chairman of Marsh & McLennan. He testified that Marsh & McLennan felt that the purchase of Stokes was the best way to procure the commercial accounts involved here (71a), but he said that this result was possible only because of the purchase of the expirations: "Most companies do buy door openers [the expirations] and this is what we bought in this case. We did not buy personnel to any extent * * *." (71a–72a).[2]

Mr. Regan, the manager of Marsh & McLennan's New York office, was the person most directly responsible for the sale. He made clear that Marsh & McLennan, in order to effectuate its interest in acquiring the commercial accounts (80a, 102a, 106a), was interested in purchasing the expirations (81a), and would have purchased the expirations alone if that were possible (107a).

"Q. What are you most interested in acquiring?

"A. Well, what I said before, what you call expirations * * *.

* * * * * *

"Q. Then you are buying the expirations plus the net worth of the business?

"A. Yes." (81a)

This testimony was corroborated by another Marsh & McLennan vice-president and three independent experts, who all testified to the effect that large commercial buyers are without sentiment, that they purchase from the broker who can give them the best coverage for the best price—and that the primary method of convincing a prospective buyer that your organization can give him the best service is by offering a policy fitted to his needs. The only way to offer such a policy is to have the information contained in the expirations records. The vice-president testified that personal contact is irrelevant, because large commercial "insurance buyers are without

---

1. See, e. g., Commissioner of Internal Revenue v. Killian, 314 F.2d 852 (5th Cir. 1963).

2. It is noted that this witness was not directly involved in the purchase of Stokes (73a).

sentiment." (142a–143a) The first expert said that it is "the usual custom" of insurance buyers to listen to the company with the expirations (153a), although these buyers also look to the present broker who also knows their needs (152a). These companies are interested in service, not personal contacts. (156a–57a) The second expert testified that the main assets a company is buying in a purchase such as this are the expirations (158a), "that is the only thing of value." (159a; see 161a) The third expert also testified that a buyer seeks expirations, not personnel or the good will of a firm. (167a, 169a) The one Government witness, who had no experience in the specialized field of tailoring commercial coverage to the individual needs of large corporations (221a), did not contradict this testimony.

Not only was there little, if any, evidence to indicate that the $69,500., allocated by Marsh & McLennan to the six commercial expirations it acquired (see 257a), was for the purchase of anything other than the expirations, but also there is positive evidence or law undercutting the conclusion that any of the four elements listed by the Tax Court as "goodwill" were purchased or could be considered goodwill.

There is no evidence that any of the $69,500. premium (as opposed to the entire purchase price) was allocated to the 2400 non-commercial accounts that came with the Stokes purchase. Marsh & McLennan specialized in large commercial accounts; when it did take personal accounts of the same type as the 2400 cited by the Tax Court, it did so as a favor to some large account:

"Our business is commercial lines. We do have a small amount of personal insurance and the persons that we have this personal insurance with, they are usually in some sound business * * *. But our business is more large commercial accounts and certainly I, personally, abhor building anything on a personal account. * * * The commission would develop, it would cost us about $500 to help handle it." (46a–47a)

Mr. Regan affirmatively testified that Marsh & McLennan was not interested in Stokes' personal accounts; the only reason these accounts were purchased was because it was the only way to acquire the expirations, "this is part of the package we had to buy." (84a–85a) These affirmative disclaimers of interest in the personal accounts were unrebutted, and, indeed, the Tax Court found that Marsh & McLennan "placed a value upon the *5 or 6 expirations* which it was primarily interested in obtaining and added such value to such net worth of Stokes. The amount of $69,550.78 *represents such calculated value * * *.*" (256a–57a) (emphasis added).[3]

---

3. The Tax Court's reliance in part on the "indivisible asset" rule, as expounded by such cases as Boe v. Commissioner of Internal Revenue, 307 F.2d 339 (9th Cir. 1962), aff'g. 35 T.C. 720 (1961), was improper. As clarified in Commissioner of Internal Revenue, v. Seaboard Fin. Co., 367 F.2d 646, 652 (9th Cir. 1966), that rule was applied in *Boe* to prevent a taxpayer from claiming that a certain amount of the purchase price could be allocated as a basis for depreciable assets, where there was "simply bargaining between the parties as to what would be paid for the business as a whole." The court continued: "We indicated in *Boe*, however, that the result would be different if * * * the individual contracts had been separately appraised." Id. at 652–653. In the instant case, the taxpayer did value the expirations it was interested in acquiring, as the Tax Court found (256a–57a), and no part of the $69,500. thereby allocated could be held under the "indivisible asset" rule to apply to goodwill.

That the five or six contracts were not individually evaluated, as was the case in *Seaboard Finance, supra,* is of no significance in this regard. In Manhattan Co. of Virginia, Inc., 50 T.C. 78 (1968), a decision reviewed by the entire court (Atkins, J., dissenting), the taxpayer purchased two customer lists containing approximately 4500 names. Because the taxpayer did not evaluate the individual value of each name, the court disallowed its deduction for annual customer loss, taken by the taxpayer on the assumption that each name was of equal value. The

The covenant not to compete was obtained to insure that the value of the exclusive use of the expirations to Marsh & McLennan would not be diminished.[4] Where a covenant not to compete is procured to protect another element involved in the purchase, it is non-severable from that other element. See, e. g., Estate of Masquelette v. Commissioner of Internal Revenue, 239 F.2d 322 (5th Cir. 1956).[5]

There is no evidence that Marsh & McLennan was interested particularly in the personal services of former Stokes employees. The contract provision that former Stokes employees be employed was a condition of sale imposed by Stokes, not Marsh & McLennan. As the Tax Court found:

"[The stockholders of Stokes] were interested in selling the business because they felt that Stokes was too small and localized an organization, * * * and because they felt that the sale to another organization would provide Stokes' staff, which included themselves, with continued employment." (255a)

Because of this purpose, Marsh & McLennan was obligated to hire Stokes' personnel, but "[n]one of Stokes' personnel were bound by contract to remain employed by [Marsh & McLennan] for any specified time."[6] (258a)

---

"indivisible asset" rule prevented the taxpayer from claiming that it had bargained for each name on an individual basis. However, the court did allow deductions for depreciation of the value assigned to the list as a whole, holding that past experience of the taxpayer had shown that the average life of customers obtained through purchase of the list was five years. The indivisible asset rule does not, therefore, prevent depreciation deductions if customer information can be assigned a value separate from goodwill, as here, and where the average useful life of the information as a whole can be estimated by calculating the average length of customer association. Also see Western Mortgage Corp. v. United States, 308 F.Supp. 333 (C.D.Cal. 10/30/69).

4. Although the Tax Court made no specific finding as to this covenant not to compete, it did note that "[u]sually a covenant not to compete is obtained from the selling brokerage firm to prevent the seller from using the insurance expiration information and to keep such information from competitors". (253a).

5. It is noted that the covenant itself is a capital asset capable of depreciation, not goodwill. E. g., John T. Fletcher, T.C. Memo 1965–273, 24 T.C.M. 1489 (1965) ; Merle P. Brooks, 36 T.C. 1128 (1961).

6. The courts and the Commissioner have consistently held that the personal qualifications of employees of a seller, where the employees are not required by contract to continue their employment with the seller or the buyer, are not an element of goodwill. The landmark case in this area is D. K. MacDonald, 3 T.C. 720 (1944). In that case, the sole owner of an insurance brokerage business dissolved the corporation, distributing all its assets to himself for the purpose of continuing the business as a partnership. He claimed no capital gain, since the assets of the business were less than its total liabilities. The Commissioner assessed a deficiency, based on his determination that the business had approximately $100,000. in goodwill, because of the "personal ability, business acquaintanceship, and other individualistic qualities of D. K. MacDonald." The Tax Court held that these personal qualifications did not represent marketable goodwill, and thus disallowed the deficiency:

"We find no authority which holds that an individual's personal ability is part of the assets of a corporation by which he is employed where * * * the corporation does not have a right by contract or otherwise to the future services of that individual." Id. at 727.

This opinion's reasoning has been consistently followed. E. g., Donal A. Carty, 38 T.C. 46, 59, n. 11 (1962) ; Rev.Rul. 60–301, 1960–2 Cum.Bull. 15. If the seller does not have marketable goodwill because the success of the firm is based on the personal qualifications of its employees, any gain the seller receives must be in exchange for something other than goodwill. It would seem, therefore, that the buyer does not receive goodwill, as that asset is contemplated by Treasury Regulation § 1.167(a)–3.

The fourth factor was the use of the Stokes name for a short time after the sale to identify Marsh & McLennan as Stokes' successor. From the testimony of the expert witnesses, it is clear that no goodwill existed in the name of Stokes' firm as to the six commercial accounts here involved. Furthermore, courts have consistently held that where the name of the seller is used only to identify the purchaser as its successor, even where the firm name may be an asset of goodwill, no purchase of goodwill is contemplated. E. g., Manhattan Co. of Virginia, Inc., 50 T.C. 78, 81–82 (1968); Savings Assurance Agency, Inc., T.C. Memo 1963–52, 22 T.C.M. 200, 201 (1963).

Marsh & McLennan did prove that the expirations had a limited life determinable with reasonable accuracy. It hired statistical experts who testified that the average life of a commercial account was 17 years. This evidence was uncontradicted, other than by the Government witness who, having no qualifications in the principles of accounting or statistics, was not qualified to testify on this point. The Tax Court disregarded this evidence on the theory that "such projection indicated that some of such accounts would continue on after the 17 year period for a long and indefinite life." (264a) The majority affirms on the theory that, because the analysis was based on similar but not identical accounts, the Tax Court was free to disregard the evidence. Either of these theories would prevent most, if not all, depreciation deductions. By its essence, an average useful life must contain the lives of assets expiring after the average as well as before the average. And because a determination of useful life is a projection, it cannot be based on the lives of the assets sought to be depreciated; it must, by necessity, look to the lives of other assets. The Regulation requires only "reasonable accuracy," not exactness. Average length of customer association, where it can be proved, has always been accepted in customer list cases. E. g., Commissioner of Internal Revenue v. Seaboard Fin. Co., 367 F.2d 646, 653 (9th Cir. 1968); Manhattan Co. of Virginia, Inc., 50 T.C. 78, 83, 93 (1963); Vaaler Ins., Inc. v. United States, 68–1 U.S.T.C. ¶ 9183 (D.N.D. 1968). That the evidence be statistical makes it no less reliable in determining the useful life with *reasonable* accuracy. See, e. g., Super Food Serv., Inc. v. Commissioner of Internal Revenue, 416 F.2d 1236 (7th Cir. 1969), *distinguishing* Commissioner v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir. 1965); Rev.Rul. 68–545, 1968–42 I.R.B. 6.

I would reverse and remand the case to the Tax Court for further proceedings not inconsistent with this opinion and subject to the right of the Tax Court to hold a supplemental trial for production of expert or other evidence if it finds such a trial is necessary for determination of the factual issues. See *Sink,* "The Unused Power of a Federal Judge to Call His Own Expert Witness," 29 So. Cal.L.Rev. 195 (1956); Rule 7–06 of Proposed Rules of Evidence for the United States District Courts (March 1969 Draft of Committee on Rules of Practice and Procedure of the Judicial Conference of the United States).