MARSH & MCLENNAN, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7019–65. Filed October 16, 1968.

*John F. Beggan*, for petitioner.
*Gary L. Stansbery*, for respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax against the petitioner for the taxable years 1961 and 1962 in the respective amounts of $1,783.22 and $7,246.27. The issue is whether the petitioner is entitled to any deduction, under section 167(a)(1) of the Internal Revenue Code of 1954, for the cost of a list of insurance customer expirations which it acquired in 1961 when it purchased an insurance brokerage business.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of Pennsylvania with its principal office in Pittsburgh, Pa., which was also the site of its principal office at the time the petition herein was filed. It keeps its books and files its Federal income tax returns on an accrual method of accounting and on a calendar year basis. The petitioner filed its returns for the taxable years 1961 and 1962 with the district director of internal revenue, Pittsburgh, Pa.

Marsh & McLennan, Inc., a Delaware corporation, owned all of the petitioner's capital stock during the period involved herein, as well as all or a substantial part of the outstanding capital stock of each of 25 other domestic and several Canadian subsidiary companies. It, through its subsidiaries, is engaged in the insurance brokerage business with nationwide offices. Sometimes hereinafter it will be referred to as petitioner's parent and it and its subsidiaries will be referred to as the Marsh & McLennan organization.

Most of the business of the Marsh & McLennan organization consists of acting as insurance broker. As such, it represents clients seeking insurance and places insurance coverage for such clients with various insurance companies. A relatively small amount of its business consists of acting as agent for insurance companies in selling insurance.

The Marsh & McLennan organization is geared to handle, as a broker, large risks of commercial clients, as opposed to insurance in the personal area, such as automobile and homeowner's insurance. It has a professional staff of engineers and other experts who develop, in accordance with clients' needs, terms of policies which are not ordinar-

ily offered by insurance companies. Policies are developed for clients in the aviation, nuclear, utility, gas, oil, chemical, steel, manufacturing, retailing, and other industries, and the insurance relates to property, employee benefit plans, business interruption, liability, surety bonds, etc. Such insurance is placed with both American and foreign companies. Included among its clients are about half of the 500 largest corporations in the United States. In 1961 it received commissions of about $47 million; in 1967 it received commissions of about $76 million.

The insurance needs of commercial clients continuously change due to changes such as new projects and new manufacturing processes, and this necessitates changes from time to time in their insurance coverage. The clients are, of course, interested in obtaining the best coverage at the lowest cost, and the competition in the insurance brokerage business in this field is severe. The insurance needs of clients in personal lines of insurance, such as homeowner and automobile insurance, are more stable and the competition is not as severe.

Over the period from 1957 to 1967 the Marsh & McLennan organization has greatly expanded its business, due in part to the acquisition of other brokerage firms. Usually the firms acquired have a few large commercial accounts which it is primarily interested in obtaining. In the acquisition of such firms it obtains "insurance expirations," consisting of the records of the firm, including copies of the insurance policies, showing the name of the insured, the amount and nature of the insurance coverage, the location of the risk, the policy expiration date, the premium, and other data concerning insurance carried by the client. Such insurance expirations aid it in obtaining renewals of the business of the acquired broker's accounts by supplying information pertinent to the insurance needs of the accounts, and permitting it an advantage over competitors for the business by furnishing it an entree to the insured which would not otherwise be available. Usually a covenant not to compete is obtained from the selling brokerage firm to prevent the seller from using the insurance expiration information and to keep such information from competitors. In addition, the Marsh & McLennan organization has made it a practice to offer employment to all employees of the acquired organizations. This served the purpose of supplying the necessary personnel to carry on the day-to-day work while such personnel were being trained in the Marsh & McLennan methods of servicing accounts. It was also helpful to have personnel who had worked on particular accounts to assist in the retention of such accounts.

Soon after acquiring a firm the Marsh & McLennan organization customarily reviewed the insurance expiration data with respect to the large corporate accounts which had been handled by the acquired

firm, with a view to making recommendations to the clients with respect to adjustment of coverage or reduction of the cost of insurance. As a consequence, in many instances coverages were changed and cancellations of policies were negotiated prior to the expiration of existing policies. After the insurance coverage on an account was altered or renewed new records were made of the insurance expiration data. The old insurance expiration data which had been acquired was retained but was used only for reference purposes as, for example, when necessary to compute retrospective rate adjustments on certain policies where premiums were to be adjusted depending upon the losses over a period of years.

In 1961 officers of the petitioner's parent, acting on behalf of the petitioner, entered into negotiations with the principal stockholders of Stokes, Packard & Smith, Inc., a Delaware corporation (hereinafter referred to as Stokes), for the acquisition of the stock of that corporation which conducted a general insurance agency and brokerage business. Most of the accounts which Stokes handled were either personal accounts or small commercial accounts. It also had a "sub-brokerage" business, which consisted of furnishing facilities and policy forms for independent brokers in return for a share of such independent broker's commissions. Stokes had five or six large commercial brokerage accounts and the petitioner was primarily interested in obtaining these accounts. The Marsh & McLennan organization had attempted, without success, to obtain these accounts by directly contacting them. Such accounts had had a long association with Stokes, and it was concluded that the acquisition of Stokes would provide a means to acquire an entree to such accounts. The stockholders of Stokes did not know which of its accounts the petitioner was primarily interested in acquiring, but they would have been unwilling to sell only a portion of their accounts. They were interested in selling the business because they felt that Stokes was too small and localized an organization, and that its facilities were inadequate to handle some of its large accounts, and because they felt that the sale to another organization would provide Stokes' staff, which included themselves, with continued employment.

As a result of the above negotiations the petitioner entered into an agreement dated September 25, 1961, whereby it purchased from the 10 stockholders of Stokes all the outstanding common and preferred stock of Stokes for the sum of $262,325 cash, plus the payment of Stokes' legal expenses of $3,058, or a total of $265,383. The agreement provided, in part, as follows:

6. *Employment of Sellers:* Subject to the closing hereof, the Buyer offers to cause Stokes or the Buyer, as Buyer elects, to employ the persons listed below at their present annual salaries. It is understood that certain of these Sellers

will also receive units of the Buyer's incentive plan (M & M Incentive Plan) and that the Buyer will advise each recipient of his number of units.

| | |
|---|---|
| E. Perot Bissell, Jr. | Val J. Klammer |
| E. Dudley Carl | Alfred R. Lauer |
| Herbert Church | Kenneth D. Lukens |
| John E. Craig | George R. Packard |
| Frederick R. Drayton | Kent Packard |

7. *Conditions Precedent of the Buyer:* The obligations of the Buyer hereunder are subject to the conditions that on or before the Closing Date:

\*       \*       \*       \*       \*       \*       \*

(e) *Employment:* The Sellers shall have agreed to accept employment with the Buyer or with Stokes in accordance with Section 6.

\*       \*       \*       \*       \*       \*       \*

(g). *Tender of Resignations:* On or before the Closing Date the Sellers will deposit with the Buyer the written resignations of all the directors and officers of Stokes as Buyer shall request.

\*       \*       \*       \*       \*       \*       \*

12. *Covenant Not to Compete:* For a period of five (5) years after the closing each Seller (except acting in the employment of Stokes or the Buyer) will not in any manner, directly or indirectly, compete with Stokes or any successor to Stokes, or to the business of Stokes, in any phase of the insurance business presently being conducted by Stokes (whether such competition shall be as an officer, director, owner, employer, partner, lender of money or other participation in any business so competing) in the States of Pennsylvania, New Jersey, Delaware and Maryland.[1]

Attached to the agreement was a balance sheet which did not list among assets any goodwill or other intangible assets. The amount which petitioner paid for the stock was $69,550.78 in excess of the net worth of Stokes as shown on its balance sheet (apparently adjusted to the date of sale). In determining the price which it would pay for the stock, the petitioner placed a value upon the five or six expirations which it was primarily interested in obtaining and added such value to such net worth of Stokes. The amount of $69,550.78 represents such calculated value adjusted, however, to some extent in order that the amount to be paid for the stock would represent a flat amount per share.

On September 30, 1961, all of the property of Stokes was distributed to the petitioner in complete liquidation of Stokes. The parties have stipulated that it is to be considered, under the provisions of section 334(b)(2) of the Internal Revenue Code of 1954, that petitioner acquired all the property of Stokes for the sum of $265,383, plus assumed liabilities of Stokes in the amount of $384,283.82 (total $649,666.82).

---

[1] One of the conditions of the contract, inserted at the insistence of the petitioner, was that Stokes obtain such a covenant from a former stockholder and associate of Stokes.

At the time of the distribution the petitioner made entries in its books and records allocating as follows the total cost of assets acquired:

| Assets acquired | Amount |
|---|---|
| Cash | $356,687.59 |
| Accounts receivable | 182,904.17 |
| Fixed assets—net of depreciation | 27,438.04 |
| Prepaid expenses | 13,086.24 |
| Insurance contracts purchased | 69,550.78 |
| Total cost | 649,666.82 |

Included in the assets acquired by the petitioner upon the liquidation of Stokes were all of Stokes' insurance expirations. It had about 2,400 accounts. Most of the policies were for a term of 1 year, but some were for terms of 3 and 5 years.[2]

All of the selling stockholders of Stokes (all of whom had been executives or employees of Stokes) accepted employment with the petitioner. Subsequently some of them retired and one died. Also, all the nonstockholder employees of Stokes were offered employment with the petitioner and most of them accepted employment. None of Stokes' personnel were bound by contract to remain employed by petitioner for any specified time. The Marsh & McLennan organization dispatched several executives and administrators from other offices to train the new personnel of petitioner in the Marsh & McLennan manner of doing business and to explain to them the facilities and expertise available in the Marsh & McLennan organization. These persons called upon the old Stokes clients, but none of them stayed as permanent personnel of the petitioner. All of the petitioner's executive personnel during the years 1961, 1962, and 1963 were former employees of Stokes except for the manager of petitioner who had been an employee of another firm acquired by the Marsh & McLennan organization in 1961. The employees obtained from Stokes continued to solicit Stokes' old clients for renewals. The account executives of Stokes had a desirable personal contact with the clients and they rendered valuable assistance in establishing a relationship between the petitioner and the clients. In those instances where an examination of an account by the Marsh & McLennan organization indicated that some change in the coverage would be appropriate, one of its employees would generally accompany the petitioner's new employee when the customer was visited. In such instances the Marsh & McLennan organization representative would inform the customer that Stokes had been acquired by the Marsh & McLennan organization.

---

[2] Within a period of about 3 years after the acquisition of Stokes the petitioner lost about 65 of the major accounts and one or more of the 5 or 6 large commercial accounts which it had been particularly interested in acquiring. The petitioner was not interested in the accounts involved in Stokes' subbrokerage business, and within a period of about 18 months abandoned or disposed of them.

For a transitional period of about 9 months to a year, the petitioner, when soliciting former clients of Stokes, used its own letterheads which, however, contained in smaller letters the statement that petitioner was successor to Stokes. When new accounts were solicited by the petitioner, stationery which contained only its own name was used. The business cards used by the petitioner contained only its own name.

In its Federal income tax returns for the taxable years 1961 and 1962, the petitioner claimed deductions of $3,429.27 and $13,935.14, respectively, as depreciation of "Insurance Contracts Purchased," based upon a cost of $69,550.78 and a 5-year life.

In the notice of deficiency the respondent disallowed the claimed deductions with the statement, "It is determined that the deduction for amortization or depreciation of the cost of insurance expirations * * * is unallowable."

OPINION

The respondent contends that the amount of $69,550.78 which the petitioner treated as the cost of obtaining Stokes' insurance expirations in reality represented the cost of all the intangible assets of Stokes, which included, in addition to the expirations, goodwill, going-concern value, and the agreement of the selling stockholders of Stokes to accept employment with the petitioner. He contends that all of these intangibles are goodwill or are in the nature of goodwill, and that, consequently, such assets are not subject to the allowance for depreciation under section 167 of the Internal Revenue Code of 1954.[3] He further contends that the covenants not to compete which were obtained from the selling stockholders were for the purpose of securing to petitioner the beneficial enjoyment of all of the above intangible assets, and are a nonseverable part of the goodwill obtained.

The petitioner contends that the full amount of $69,550.78 constituted the cost to it of 5 or 6 of the largest commercial accounts of

---

[3] Sec. 167 (a) of the Code provides as follows :

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolesence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

Both parties also rely on sec. 1.167(a)–3 of the Income Tax Regulations which provides, in pertinent part, as follows :

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

Stokes, which were the accounts it was primarily interested in acquiring. It further contends that it was not interested in acquiring any goodwill of Stokes, and that indeed there was no transferable goodwill. Its position also is that the covenants not to compete were obtained as an integral part of the purchase of the expirations. It, therefore, contends that what it purchased did not partake of the nature of goodwill, but was an asset the useful life of which was limited to the time remaining before the insurance policies to which the expirations related expired. Since all of the policies acquired expired within 5 years of the date of acquisition, petitioner maintains that it properly depreciated the cost of the expirations over a 5-year period. It contends, in the alternative, that if it is determined that the expiration information obtained was useful after petitioner's first presentation of an insurance program to the client, then it should be permitted to amortize and deduct the cost of the expirations over a period of 17 years, which it contends is the average period of time petitioner can reasonably expect to retain a commercial client.

In *Alfred H. Thoms*, 50 T.C. 247, we considered the nature of insurance expirations. We there recognized that the cases involving insurance expiration lists have not been uniform in their holdings with respect to whether such an intangible asset has a reasonably ascertainable useful life. However, we pointed out that an expiration list has become, in the insurance field, recognized as a valuable asset in the nature of goodwill. We there concluded that where a taxpayer purchases a going general-insurance agency business, including the goodwill and list of insurance expirations and other intangible assets, the insurance expirations list is a part of the goodwill which has an indefinite useful life, and that it is therefore not subject to any allowance for depreciation.

While the factual situation presented in the *Thoms* case differs somewhat from that presented in the instant case, we think the principle of that case is governing here.

Here the petitioner purchased all the stock of Stokes and immediately liquidated Stokes and took over all its assets. Thus, it obtained a going business together with all intangible assets, including whatever goodwill Stokes enjoyed. While petitioner was interested primarily in obtaining the large commercial brokerage accounts of Stokes, particularly five or six of the largest ones, and determined the amount which it was willing to pay for the stock of Stokes by adding to the book value of the tangible assets of Stokes an amount which it determined to be the value of such five or six accounts, the fact is that for the $69,550.78 the petitioner acquired *all* the 2,400

expirations of Stokes, together with whatever other intangible assets existed.[4]

As stated, the petitioner contends that it was not interested in acquiring any goodwill of Stokes, and that indeed Stokes had no goodwill. We believe, however, that Stokes did have goodwill, and that the petitioner was interested in obtaining such goodwill even though it may have been primarily interested in the goodwill relating to only five or six of the largest commercial accounts. These five or six accounts had been held by Stokes for a long time and the Marsh & McLennan organization had endeavored, without success, to acquire them by direct contact with the clients. The chairman of the board of directors of petitioner's parent testified that these large commercial accounts "had a long association with Stokes and we just felt that this [the purchase of stock] was a good way to buy our introduction." And, as stated, the petitioner did obtain *all* the expirations and apparently made use of all of them, although it disposed of those relating to a subbrokerage business within a relatively short time. One of the conditions to the purchase of the stock was that the stockholders (who were executives or employees of Stokes) agree to accept employment with the petitioner. It seems reasonable to conclude that this condition was imposed, at least in part, in order to have the assistance of such employees in contacting and attempting to retain Stokes' accounts. The evidence shows that the account executives of Stokes had a desirable personal contact with the clients and that they did render valuable assistance in establishing a relationship between the petitioner and Stokes' clients.

In view of the above, it is our conclusion that the expirations involved herein were so inextricably linked with goodwill that they cannot be considered as having an existence separate therefrom. Since goodwill is nondepreciable it follows that the amount of $69,550.78 which petitioner allocated on its books to insurance contracts purchased may not be amortized and deducted as depreciation under section 167 and the regulations thereunder.

Moreover, even if it were considered that the $69,550.78 constituted a payment for the insurance expirations, separate and apart from the goodwill as such, we nevertheless would feel constrained to hold that the payment was for an asset the useful life of which cannot be determined with reasonable accuracy and that such payment cannot be amortized and deducted as depreciation.

---

[4] In this connection there is no evidence that in fixing the amount of the purchase price of the stock the parties to the agreement agreed upon the value of any of such assets individually, and there is no evidence upon which the cost could be allocated among such assets. We are not advised as to the details of the negotiations leading up to the transaction.

A number of cases have held that a customer list or an insurance expirations list constitutes a single asset (as distinguished from a number of individual accounts) which has an indefinite useful life and is therefore not depreciable, or subject to loss deductions as individual customers or accounts are lost. See *Anchor Cleaning Service, Inc.*, 22 T.C. 1029; *Boe* v. *Commissioner*, (C.A. 9) 307 F. 2d 339, affirming 35 T.C. 720; *Thrifticheck Service Corp.*, 33 T.C. 1038, aff'd. (C.A. 2) 287 F. 2d 1; and *Hugh H. Hodges*, 50 T.C. 428. In the instant case the petitioner acquired the list of expirations, as distinguished from individual expirations. Indeed, Stokes did not know what particular expirations the petitioner was primarily interested in obtaining.

We cannot agree with the petitioner that the expiration information had no value after the petitioner's first presentation of an insurance program to the client. While we recognize, as contended by the petitioner, that future renewals would depend upon the service which it rendered to the clients, the fact remains that but for the entree provided by the original expiration information, the petitioner would not be in a position to obtain such future renewals. Furthermore, the useful life of the expiration information did not expire upon the expiration of the 5-year term of the covenant not to compete. As we stated in *Alfred H. Thoms, supra*, it would be unreasonable to assume that after a 5-year period of doing business with the clients, without competition from the sellers, the petitioner would be cut off from future benefits the day the sellers were free to start up again in the insurance business.

Nor can we accept the petitioner's contention that 17 years should be considered as the useful life of the expirations. Such contention is based upon evidence of a statistical analysis of a portion of the commercial accounts handled in 1950 by the Chicago office of the Marsh & McLennan organization. Such analysis showed that of 122 accounts taken into consideration, 46 were still in existence in 1965 when the analysis was made. A statistical projection of the length of retention of the remaining 46 accounts was made which indicated an average life of the 122 accounts of about 17 years. However, such projection indicated that some of such accounts would continue on after the 17 years for a long and indefinite period. Accordingly, we do not think this evidence can be considered as establishing that an expiration list such as is here involved has a limited life the length of which can be estimated with reasonable accuracy. In this connection it should be observed that while the evidence shows that within about 3 years after the acquisition of Stokes the petitioner lost some of Stokes' larger accounts, including one or more of the 5 or 6 commercial accounts which it had been primarily interested in acquiring, insofar as appears

from the record the petitioner at the time of the trial continued to retain the rest of the accounts or a substantial portion thereof.

The petitioner also contends (for the first time on brief) that if we determine that the cost of the expiration information and other intangibles acquired is not depreciable, "a large portion of the purchase price should be allocated to the covenants not to compete and amortization of this amount should be allowed," over the 5-year term of the covenants not to compete. We cannot agree. In the contract for the sale of the stock no portion of the cost was allocated to the covenants not to compete, and there is no evidence that in the negotiations the parties intended that any portion of the cost should separately relate thereto. We think that the function of the covenants in this case was to assure the petitioner the beneficial enjoyment of the goodwill, including the expirations, it had obtained. They had no independent significance apart from assuring the effective transfer of such goodwill. See *Alfred H. Thoms, supra; Toledo Blade Co.*, 11 T.C. 1079 (C.A. 6), 180 F. 2d 357, certiorari denied 340 U.S. 811; and *Aaron Michaels*, 12 T.C. 17. Accordingly, no portion of the purchase price is allowable as depreciation of such covenants.

We hold that the respondent did not err in disallowing the claimed depreciation deductions.

*Decision will be entered for the respondent.*