570

ROBERT G. TOMLINSON, SURVIVING HUSBAND, AND BARBARA S. TOMLIN-
SON, DECEASED, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 457–68—463–68, 3553–68.   Filed June 29, 1972.

*James R. Moore*, for the petitioners.
*Stephen E. Silver*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the in-
come taxes of petitioners as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 457–68 | Robert G. Tomlinson, surviving husband, and Barbara S. Tomlinson, deceased. | 1964 | $958.87 |
| | | 1965 | 1,203.00 |
| 458–68 | William W. Jewett and Natalie D. Jewett | 1964 | 2,708.98 |
| | | 1965 | 3,749.91 |
| 459–68 | Estate of Thomas K. Sammons, deceased, and Luwayne E. Sammons. | 1964 | 891.00 |
| | | 1965 | 1,299.00 |
| 460–68 | Robert G. Bowden and Virginia H. Bowden | 1964 | 770.50 |
| | | 1965 | 873.88 |
| 461–68 | Thomas J. Fohl and Geraldine L. Fohl | 1964 | 841.15 |
| | | 1965 | 1,887.49 |
| 462–68 | Ralph D. Floberg and Judy S. Floberg | 1964 | 975.04 |
| | | 1965 | 1,319.16 |
| 463–68 | H. Hallock Bartlett and Josephine D. Bartlett | 1964 | 1,075.51 |
| | | 1965 | 1,503.95 |
| 3553–68 | William B. Johnson and Edith P. Johnson | 1964 | 3,684.54 |
| | | 1965 | 4,159.46 |

Because of common issues, the cases were consolidated for trial.
The question presented for our decision is whether certain intangible

---

[1] Cases of the following petitioners are consolidated herewith: William W. Jewett and
Natalie D. Jewett, docket No. 458–68; Estate of Thomas K. Sammons, deceased, and
Luwayne E. Sammons, docket No. 459–68; Robert G. Bowden and Virginia H. Bowden,
docket No. 460–68; Thomas J. Fohl and Geraldine L. Fohl, docket No. 461–68; Ralph D.
Floberg and Judy S. Floberg, docket No. 462–68; H. Hallock Bartlett and Josephine D.
Bartlett, docket No. 463–68; and William B. Johnson and Edith P. Johnson, docket No.
3553–68.

assets, i.e., insurance expirations and a loss experience record, are subject to depreciation; or whether, in the alternative, the expirations, specifically, can be deducted as business losses in the year they expire and are not renewed.

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Robert G. Tomlinson (sometimes hereinafter Tomlinson) and his wife, Barbara S. Tomlinson, filed joint individual income tax returns for the taxable years 1964 and 1965. At the time the petition of Robert G. Tomlinson and the Estate of Barbara S. Tomlinson was filed, petitioners were residents of Portland, Oreg.

William W. Jewett (sometimes hereinafter Jewett) and Natalie D. Jewett, husband and wife, filed joint individual Federal income tax returns for the taxable years 1964 and 1965. Both petitioners were residents of Portland, Oreg., at the time their petition herein was filed.

Thomas K. Sammons (hereinafter Sammons) and Luwayne E. Sammons, husband and wife, filed joint individual Federal income tax returns for the taxable years 1964 and 1965. At the time the petition of the Estate of Thomas K. Sammons and Luwayne E. Sammons was filed with this Court, petitioner United States National Bank, as executor of the Estate of Thomas K. Sammons, had its principal place of business in Portland, Oreg., and petitioner Luwayne E. Sammons was a resident of Portland, Oreg.

Robert G. Bowden (hereinafter Bowden) and Virginia H. Bowden, husband and wife, filed joint individual income tax returns for the taxable years 1964 and 1965. At the time their petition herein was filed petitioners were residents of Portland, Oreg.

Thomas J. Fohl (hereinafter Fohl) and Geraldine L. Fohl, husband and wife, filed joint individual Federal income tax returns for the taxable years 1964 and 1965. At the time their petition herein was filed petitioners were residents of Beaverton, Oreg.

Ralph D. Floberg (hereinafter Floberg) and Judy S. Floberg, husband and wife, filed joint individual Federal income tax returns for the taxable years 1964 and 1965. At the time their petition herein was filed petitioners were residents of Portland, Oreg.

H. Hallock Bartlett (hereinafter Bartlett) and Josephine D. Bartlett, husband and wife, filed joint individual Federal income tax returns for the taxable years 1964 and 1965. At the time their petition herein was filed, petitioners were residents of Portland, Oreg.

William B. Johnson (hereinafter Johnson) and Edith P. Johnson,

husband and wife, filed joint Federal income tax returns for the taxable years 1964 and 1965. At the time their petition herein was filed petitioners were residents of Portland, Oreg.

The joint individual income tax returns of all petitioners were filed with the district director of internal revenue, Portland, Oreg.

During the tax years in question, petitioners Tomlinson, Jewett, Sammons, Bowden, Fohl, Floberg, Bartlett, and Johnson were all general partners in the Jewett, Barton, Leavy & Kern partnership (hereinafter JBL&K), a general insurance brokerage firm established in 1870 and located in Portland, Oreg. In 1964 JBL&K was one of the two largest independent insurance brokerage firms in Portland and since that time it has become the largest. Petitioners' respective partnership interests, as of February 1, 1964 (after the acquisition of the Schmeer businesses hereinafter described), were as follows:

| Name of partner | Percent of interest | Name of partner | Percent of interest |
| --- | --- | --- | --- |
| Jewett | 20 | Sammons | 8. 57 |
| Johnson | 20 | Smith | 8. 57 |
| Floberg | 8. 58 | Bowden | 8. 57 |
| Bartlett | 8. 57 | Tomlinson | 8. 57 |
| Fohl | 8. 57 | | |

Prior to 1964, JBL&K had become interested in insuring the consumer credit loans of the United States National Bank of Oregon (sometimes hereinafter the bank). At that time the firm was handling some of the bank's general insurance business and several of the partners were close friends of bank officials. Other insurance agencies also had developed an interest in the acquisition of the bank's consumer finance insurance business, but all were unsuccessful in their efforts to obtain it except Schmeer Insurance Agency, Inc. (sometimes hereinafter SIAI or corporation). During the period 1949–63 JBL&K and the other agencies had seen SIAI profit from the increasing number of policies written and the growing premiums derived from the bank's consumer borrowers.[2] The reason behind SIAI's success was its historical loss experience records in the consumer finance line of insurance which enabled it to market the policies with large insurance underwriters. SIAI's loss experience records were the result of almost 15 years of activity in the consumer finance insurance line, and with them the corporation was able to quote the bank a set annual premium, which meant that the bank was assured of not being charged an audit premium at the end of each year. Without access to the highly con-

---

[2] These insureds were generally not desirable on an individual basis from an insurance standpoint because of a high risk factor. However, when written as a group they were profitable insurance business.

fidential loss experience information in the SIAI files, no other local agency could enter this special line of insurance. Consequently, because of the exclusive nature of the Schmeer loss experience records, several firms in Portland were interested in purchasing SIAI.

Sometime shortly before February 1964, William Jewett, acting on behalf of JBL&K, approached James H. Schmeer (sometimes hereinafter Schmeer) and expressed his firm's desire to purchase both all of the stock in Schmeer Insurance Agency, Inc., and the assets of Schmeer Insurance Agency (sometimes hereinafter Schmeer partnership), a copartnership. Schmeer was 64 years old at the time and had previously been considering a similar transaction with other local insurance agencies, with a view to his own retirement. However, he was especially attracted to Jewett's proposal due to the fact that in the sale of both his businesses, Schmeer wanted to make certain that his son-in-law, Robert Tomlinson, a 25-percent partner in the Schmeer partnership, would acquire an ownership interest in some other reputable insurance agency as a part of the sale transaction. Because it was a prominent firm and Jewett expressed a desire to have Tomlinson affiliate as a partner, Schmeer decided to negotiate the sale of his two businesses with JBL&K.

SIAI was a small corporation whose stock was wholly owned by James H. Schmeer. Tomlinson was not a shareholder or employee of the corporation and he had no connection with its business. The only business of SIAI concerned the handling of insurance on the bank's consumer loans.[3] Under this arrangement, the bank would, as a part of its loan procedure, require the security for the loan to be insured. If the borrower did not obtain his own insurance, the bank would request SIAI to obtain insurance for him. The SIAI policy named the bank as payee and it normally remained in effect only during the term of the loan. These policies were seldom, if ever, renewed.

The business of the Schmeer Insurance Agency, the partnership, was the normal business of a general agency which included fire, casualty, and liability insurance. Though the firm was primarily interested in commercial clients, it serviced both business and personal accounts. The partners of the business were Schmeer, who owned a 75-percent interest, and Tomlinson, who held a 25-percent interest. Both the partnership and SIAI were operated from offices in the Cascade Building in downtown Portland.

As a result of negotiations with William Jewett, Schmeer decided to sell his entire interest in both businesses and the sales were consummated by two separate written agreements dated February 1, 1964.

---

[3] Most of the consumer loans were for automobiles and consequently automobile casualty insurance constituted the majority of the policies written by SIAI on the bank's borrowers.

Under the SIAI sales contract, Schmeer was to transfer the entire 300 shares of SIAI stock outstanding to JBL&K in return for:

(a) A sum equal to the net worth of Schmeer Insurance Agency, Inc. as indicated by a balance sheet to be prepared, attached hereto and labeled "Exhibit A" dated January 31, 1963, except that no sum shall be paid under this subparagraph (a) for any intangible assets set forth on said balance sheet, including, without limitation, good will, customer accounts, lists, policies and renewals, licenses or franchises, the sum set forth in subparagraph (b) being in payment for such items. * * *

(b) The sum of One Hundred Sixty-Eight Thousand, Five Hundred Seventy-one and 66/100 ($168,571.66) Dollars.

(c) A sum equal to the amount of all contingent fees or commissions received by the corporation subsequent to the effective date of the sale of stock herein provided for but applicable to insurance written prior to the effective date of such sale, less those sums which bear the same proportion to the total amount of State and Federal taxes levied on or measured by income of the corporation in the years in which said contingent fees or commissions are taxed to the corporation as the said contingent fees or commissions bear to the total income of the corporation in the said years.

The contract contained the other general provisions of a standard sales agreement and included a seller's noncompetition agreement which provided:

4. Solely in order to protect the value of the customer accounts, lists and renewals of Schmeer Insurance Agency, Inc. being sold to Purchaser, and its good will connected therewith, Seller agrees that he will not attempt by any means to have renewals of existing insurance contracts of Schmeer Insurance Agency, Inc. or Schmeer Insurance Agency placed through any other agency than Schmeer Insurance Agency, Inc. or Purchaser, and further agrees that for a period of five (5) years he shall not carry on or engage or be interested directly or indirectly in any business competing or interfering with the business of Purchaser or Schmeer Insurance Agency, Inc. and the parties hereto agree that Seller shall be paid no compensation for this non-competition agreement and that no part of the purchase price set out in paragraph 3 shall be attributable to this non-competition agreement.

Among the assets listed on the SIAI balance sheet used to determine the purchase price was a goodwill account valued at $55,000. The final price for SIAI computed under the terms of the sale contract was $275,362.82, which the parties calculated by multiplying the business' average commission income for the past 3 years by 1½ and adding that figure to the net worth of the corporation as derived under subparagraph (a) of the sales contract. The parties allocated $168,571.66 of the total purchase price paid for the stock to "insurance expirations." This amount equals 1½ times the annual commissions which the policies of insurance, issued to insureds of Schmeer Insurance Agency, Inc., were earning on the sale date.

A second sales contract dated February 1, 1964, provided the terms for the purchase of Schmeer partnership. The provisions of this agree-

ment required six of the existing eight partners in JBL&K to convey to Tomlinson a percentage of their interest so that he would acquire 8.57 percent of the purchasing partnership. Additionally, JBL&K was to pay Schmeer $31,626.50, plus a sum equal to three-fourths of the book value of the office furniture and office equipment of Schmeer partnership.[4] In consideration for the JBL&K interest and the cash, Tomlinson and Schmeer agreed to the following:

(a) To transfer or cause to be transferred to JBL&K all customer accounts, lists, policies and renewals of Schmeer Insurance Agency, a copartnership, of which the said Tomlinson and Schmeer are all of the general partners, as well as the right to any renewal or future commissions which shall be generated by said customer accounts, lists, policies, or renewals, but no cash or accounts receivables shall be transferred.

(b) To transfer or cause to be transferred to JBL&K all office furniture or equipment owned by Schmeer Insurance Agency * * *.

(c) Tomlinson shall further pay in cash to JBL&K for the benefit of Partners a sum equal to eight and 57/100 (8.57%) of the net worth of JBL&K on January 31, 1964. For the purpose of this provision a financial statement of JBL&K is to be prepared, attached hereto, marked "Exhibit A", and incorporated herein, and such balance sheet and net worth shall include eight and 57/100 percent (8.57%) of the purchase price paid by JBL&K prior to February 1, 1964, for the Swan Agency and eight and 57/100 percent (8.57%) of the net profit for the Swan Agency for the period beginning with the purchase of such agency and ending January 31, 1964. Tomlinson shall be allowed a credit against the payment provided by this subparagraph (c) in the amount of one-fourth of the book value of the office furniture and office equipment of Schmeer Insurance Agency and shall pay the balance of said sum by applying to said obligation all profits received from JBL&K as a partner thereof except the sum of One Thousand ($1000) Dollars per month received in salary and Five Hundred ($500) Dollars per month received as draw, and all sums necessary to pay Federal and State income taxes on income received from JBL&K.

The insurance expiration information acquired from both Schmeer businesses was organized on a client-by-client basis. Each insured's file contained the policy expiration date and in addition may have contained one or more of the following:[5]

(a) Correspondence with companies, underwriters, claim agents, insureds, finance companies, etc.
(b) Claim adjustments.
(c) Property appraisals for fire insurance rating.
(d) Premium audits.
(e) Premium financing reports.
(f) Rating bureau information.
(g) Information concerning loss experience.

Some of this information was helpful to JBL&K in obtaining renewals of the policies written by the Schmeer partnership and in servicing the

[4] The amount eventually paid Schmeer for his three-fourths interest in the office equipment was $1,984.83.
[5] At the time of the purchase JBL&K did not evaluate each individual and commercial account of Schmeer partnership.

policyholders' needs. In addition, JBL&K obtained from SIAI files the total loss experience of preceding years on business related to policies issued to consumer debtors of the bank.

Contemporaneous with the sale of SIAI stock and the assets of Schmeer partnership, Tomlinson and Schmeer, as partners in the Schmeer partnership, made a separate agreement between themselves which provided as follows:

WHEREAS, Tomlinson and Schmeer are partners in Schmeer Insurance Agency, a partnership, and

WHEREAS, Schmeer and Tomlinson desire to dissolve their said partnership and wind up its affairs, and

WHEREAS, Tomlinson desires to receive a greater share of the good will and customer accounts, lists, policies and renewals, representing the same, of the partnership than his present interest therein entitles him to, and also desires to receive a share of the office furniture which was contributed by Schmeer, and

WHEREAS, Tomlinson desires to purchase said excess portion from Schmeer and use it as a part of his contribution to a partnership in which he intends to become a partner and Schmeer intends to sell the remainder of his share of said good will and office furniture to the partnership in which Tomlinson intends to become a partner;

It is therefore agreed by and between the parties as follows:

1. The value of the customer accounts, lists and renewals of Schmeer Insurance Agency and its good will represented thereby is the sum of $139,620.54.

2. That Schmeer is entitled to three-quarters of such good will and Tomlinson is entitled to one-quarter thereof.

3. That Schmeer Insurance Agency shall be dissolved and shall be immediately wound up.

4. That upon such winding up all of the net assets of the firm shall be split between the parties hereto according to their respective interests therein except that the customer accounts, lists, and renewals representing good will shall be treated as follows:

Schmeer hereby sells to Tomlinson a portion of the good will Schmeer is entitled to on dissolution equal to 73089.90/139620.54 of the entire good will of the partnership and Tomlinson shall pay Schmeer for said portion of Schmeer's good will the sum of $73,089.90.

5. Tomlinson shall pay such amount in installments of $6,000 per year, the first installment to be paid March 1, 1969, and a like payment shall be made on March 1, of each year thereafter until the whole sum of $73,089.90, with interest at five percent (5%) per annum shall have been paid.

6. It is understood and agreed between the parties hereto that such payments shall be due regardless of the portion of the business of Schmeer Insurance Agency which is retained by Tomlinson or any firm in which Tomlinson is or becomes a partner, owner or shareholder.

In July 1969 Tomlinson paid Schmeer $56,000 in full settlement of their agreement in accord with their mutual assent to accelerate and discount the $73,089.90 payment plan.

Shortly after the purchase of the Schmeer partnership and SIAI, both entities were dissolved and liquidated into the purchasing partnership JBL&K. The offices of the two Schmeer businesses in the Cas-

cade Building were closed and the physical assets and files were moved to the JBL&K offices in the Lewis Building. Thereafter, all phone calls made to either SIAI or Schmeer partnership were transferred to the JBL&K switchboard. Attendantly, the Schmeer employees became employees of JBL&K and worked for the new partnership until they retired or found jobs elsewhere. After the sale of his businesses, Schmeer also became a part-time employee of JBL&K for a short period. He had a desk at the JBL&K offices and he was paid a salary for his services which were primarily consultative in nature.

At the time of the purchase the Schmeer partnership and SIAI were both active, profitable insurance agencies. Both businesses had good reputations in the Portland community. JBL&K therefore had the desire to retain as many of the clients of Schmeer partnership as possible, in addition to its acquisition of the consumer finance insurance business of SIAI from its one substantial customer, the United States National Bank of Oregon. Accordingly, upon becoming a new partner in JBL&K, Tomlinson, who had been handling about one-third of the Schmeer partnership accounts, sent a letter to the policyholders of the Schmeer partnership, explaining that JBL&K had bought the agency and would continue to service their insurance needs.[6] This letter of transition displayed the Schmeer Insurance Agency name under the JBL&K letterhead. Likewise, the Schmeer name was mentioned in other early correspondence with former clients of the Schmeer partnership. Tomlinson also continued to handle his old clients after joining JBL&K.

Since one of the primary reasons for the JBL&K purchase of the Schmeer businesses was to obtain the SIAI loss experience records and thus gain access to the consumer finance insurance market, the firm expected and desired to retain the bank's business, enjoyed at that time solely by SIAI. For this reason, prior to the sale of SIAI Jewett gained assurances from the bank, and with the help of Schmeer, from the insurors who underwrote Schmeer's consumer loan accounts, that JBL&K would be able to continue the business as successor to SIAI.

Following the JBL&K acquisition of the Schmeer businesses, the firm used the Schmeer loss experience records to continue the consumer finance insurance line previously offered by SIAI. The loss experience files were considered by JBL&K as the only thing of value purchased from SIAI[7] because of the risky nature of the individual insureds as clients and because there were almost no renewals of these casualty policies by the insureds once they had paid off their loan. On the other

---

[6] No such letters were sent to the insureds of SIAI.

[7] The loss experience records had a useful life of only 3 to 5 years since that period was used by the underwriters to negotiate the policy premiums to be charged. When the records became over 5 years old, they were completely obsolete.

hand, JBL&K did utilize the expiration date information contained in the Schmeer partnership files to gain a competitive advantage over other local insurance agencies by soliciting renewals of the policies before they lapsed.

On his 1964 Federal income tax return, Schmeer reported capital gains from the sale of both his interests as follows:

| Property | Date acquired | Date sold | Sales price | Cost | Sales expense | Long-term gain |
|---|---|---|---|---|---|---|
| Partnership expirations | Jan. 2, 1962 | Feb. 1, 1964 | $31,626.50 | 0 | $100.00 | $31,526.50 |
| Stock of corporation Schmeer Ins. Agency | Dec. 14, 1960 | Feb. 1, 1964 | 275,362.82 | $5,000 | 1,398.12 | 268,964.70 |

On its U.S. partnership return of income JBL&K attributed a 5-year useful life to the SIAI insurance expirations. These expirations were listed in the firm's books at a cost of $168,571.66. JBL&K also attributed a 5-year useful life to the insurance expirations from the Schmeer partnership. These expirations were listed in the firm's books at a cost of $31,626.50. Accordingly, on the JBL&K partnership returns filed for the taxable years 1964 and 1965, the firm claimed $36,702.98 and $40,039.63, respectively, as an amortization deduction for the insurance expiration accounts. The Commissioner disallowed the total amortization deductions claimed by the partnership for the insurance expirations, in both 1964 and 1965, on the ground that the expirations do not have a determinable useful life.

OPINION

At issue is whether petitioners are entitled to a depreciation deduction under section 167 [8] or a business loss deduction under section 165 for certain intangible assets acquired when their partnership, JBL&K, purchased two insurance businesses. The bulk of the intangible assets consisted of the insurance expirations purchased from the Schmeer partnership and a valuable loss experience record, acquired with the purchase of SIAI, which enabled JBL&K to enter the consumer loan line of insurance.

Respondent contends that neither the insurance expirations nor the loss experience information is subject to allowance for depreciation, and that amounts paid therefor are not deductible as business losses. Citing among other cases [9] *Marsh & McLennan, Inc.* v. *Commissioner*, 420 F. 2d 667 (C.A. 3, 1969), affirming 51 T.C. 56 (1968), and

---

[8] All section references are to the Internal Revenue Code of 1954, as amended, unless specifically designated otherwise.

[9] Respondent also relies on *Meyer Morris,* T.C. Memo. 1968-295.

*Alfred H. Thoms*, 50 T.C. 247 (1968), he maintains that the expirations, as a matter of law, are assets in the nature of goodwill and therefore not depreciable or amortizable. Furthermore, he points out that even disregarding his matter-of-law argument and turning instead to the facts, petitioners are not entitled to depreciation deductions on the expirations which have no determinable useful life and were not valued on an individual account-by-account basis for purposes of the sale. Likewise, respondent argues that petitioners are not entitled to a business loss deduction on the expirations because they failed to prove what portion of the expirations was not renewed in the years at issue or what the respective values of the unrenewed accounts were. It is not altogether clear on what grounds respondent denied petitioners' claimed amortization or business loss deduction for the loss experience record. Apparently, he contends that like the expirations, the loss experience files have no determinable useful life and were not given a specific value in the sales transaction.

Petitioners' position is that they are entitled to a deduction for depreciation on both the insurance expirations and the loss experience information. They argue that whether such intangible assets are depreciable is a determination of fact, not law, and that at trial they adduced sufficient evidence concerning the value and the useful lives of the individual assets to substantiate the correctness of their claimed deductions. Alternatively, they contend that if the expirations are nondepreciable as a matter of law, they nevertheless are entitled to a business loss deduction for the insurance expirations that matured but were not renewed during 1964 and 1965. The loss experience, they argue, is depreciable in any event because it was the only intangible asset purchased from SIAI and it clearly has a determinable useful life.

At trial, respondent objected to the testimony of petitioners' expert witness, M. J. Holbrook, which was directed primarily to establishing what in his opinion was a reasonably accurate useful life for the insurance expirations and the loss experience information. Respondent's objection was predicated on his position that the expirations are not subject to depreciation as a matter of law. Thus, we are faced with the preliminary issue whether we will consider Holbrook's expert testimony in rendering our decision on the expirations. To answer the question we must decide whether the premise upon which respondent bases his objection is valid, viz, is the amortization of the expirations a question of law or fact.

It is our opinion that the expirations are not, as a matter of law, nondepreciable. Though relatively few taxpayers have succeeded in winning this Court's sanction of similar claimed deductions, the nu-

merous cases which have denied them have been decided on the particular facts in each situation and not as a matter of law. See *Commissioner* v. *Seaboard Finance Co.*, 367 F.2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court. The two recent cases, *Alfred H. Thoms*, *supra*, and *Marsh & McLennan, Inc.*, 51 T.C. 56 (1968), affd. 420 F.2d 667 (C.A. 3, 1969), are excellent examples. In both cases this Court readily accepted petitioners' evidence to establish a useful life for the insurance expirations. Furthermore, the two opinions went to great lengths to explain why petitioners' evidence had failed to carry their positions. Those decisions, as numerous others, were based on the finding that in each case the insurance expirations were part of a going concern and so inextricably linked with goodwill that they could not be separated therefrom, and therefore their useful life could not be determined with reasonable accuracy.

This Court, on occasion, has found on the facts that expirations are not linked with goodwill,[10] thus enabling the taxpayer to depreciate the assets. Indeed, the provisions of respondent's own regulations[11] imply that a taxpayer is entitled to the opportunity to prove that experience and other factors make it possible to estimate with reasonable accuracy the useful life of such assets. Accordingly, we conclude that Holbrook's testimony is admissible.

With respect to the acquisition of the intangible assets, the evidence clearly indicates that JBL&K purchased two separate businesses, SIAI and Schmeer partnership. Hence, we will deal with the assets of each business separately.

When JBL&K acquired the assets of Schmeer partnership it bought a complete business. Among the assets of an active general insurance agency are usually such intangible assets as goodwill, customer lists, and insurance expirations. We have long recognized that these intangibles are capital assets. *Edward A. Kenney*, 37 T.C. 1161 (1962); *George J. Aitken*, 35 T.C. 227 (1960); *Aaron Michaels*, 12 T.C. 17 (1949); *Commissioner* v. *Killian*, 314 F.2d 852 (C.A. 5,

---

[10] See *General Insurance Agency, Inc.*, T.C. Memo. 1967–143, where the Court found there was no goodwill to acquire from the insurance agency selling its assets since the owner had an infamous reputation about town. As a result we concluded the expirations, being sold free of goodwill, were depreciable.

[11] Sec. 1.167(a)–3, Income Tax Regs., provides:

Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

1963), affirming a Memorandum Opinion of this Court. Furthermore, we have generally adhered to the principle that when insurance expirations are purchased as a part of a viable insurance agency business, the expiration lists are so closely and inextricably linked to goodwill the two cannot be separated. And, since goodwill is nondepreciable it follows that the expirations cannot be amortized or deducted as depreciation. *Marsh & McLennan, Inc.*, supra; *Alfred H. Thoms*, supra; *S. S. Ballin Agency, Inc.* v. *Commissioner*, 446 F.2d 554 (C.A. 3, 1971), affirming a Memorandum Opinion of this Court.[12]

The evidence is conclusive that JBL&K expected to and did purchase Schmeer partnership as a going concern. All of the factors we considered present an overall indication that JBL&K bought the entire business. Suffice it to say that Schmeer Insurance Agency was a reputable and profitable firm in Portland at the time of the sale. It is axiomatic, then, that such a business would possess a certain amount of goodwill. The tangible evidence that JBL&K sought to obtain the partnership's goodwill in the purchase is the sales contract in which Tomlinson and Schmeer promised to transfer all customer accounts, lists, policies, and renewals of the partnership to the buyers. These assets, in our opinion, constituted a very important part of Schmeer partnership goodwill. See *Buckeye Union Casualty Co.*, 54 T.C. 13 (1970), affd. 448 F.2d 228 (C.A. 6, 1971); *Commissioner* v. *Killian*, supra. Attendantly, in Tomlinson's contract to purchase a larger share of the Schmeer partnership assets from his father-in-law so that he might become a partner in JBL&K, he promised to pay $73,089.90 for a "greater share of the good will and customer accounts, lists, policies and renewals, representing the same."

The partners of JBL&K also indicated their desire to preserve the acquired goodwill by affiliating both Schmeer and Tomlinson with their firm, by sending a letter to Schmeer partnership's clients explaining the new arrangement, and by engaging in further efforts to retain all Schmeer partnership customers.

Based on all the evidence before us we conclude that the expirations and other intangibles were so closely related to the goodwill acquired from the partnership by JBL&K that they cannot be separated, and since goodwill is nondepreciable, no deduction for amortization or depreciation of the expirations is allowable. In light of this conclusion we do not have to determine JBL&K's basis in the expirations. Furthermore, we feel constrained to add, without discussion at this time, that even if we were to agree that the expirations

---

[12] See also, *Meyer Morris*, supra; *Arthur J. Grimm*, T.C. Memo. 1970-123; *John T. Fletcher*, T.C. Memo. 1965-273.

were severable from goodwill and had a separate and determinable basis, we nevertheless would be forced to hold that the amounts paid for the expirations were for an asset whose useful life cannot be determined with reasonable accuracy, thus rendering it not subject to depreciation. *Marsh & McLennan, Inc., supra*.[13] See also *Potts, Davis & Co.* v. *Commisisoner*, 431 F.2d 1222 (C.A. 9, 1970), affirming a Memorandum Opinion of this Court.

Petitioners' alternative argument with respect to Schmeer partnership expirations also is untenable. Taxpayers contend they are entitled to a business loss deduction for each of the policies that expired during the years at issue. However, to be entitled to a business deduction for the unrenewed policies petitioners would have to establish the individual value of each unrenewed insurance policy. This they failed to do.

Petitioners contend their method for determining the proper value of the business, multiplying the average annual commissions for the past 3 years by one and one-half, is an industrywide practice and, though it does not require the separate appraisal of each account, an individual client can be valued, if need be, simply by multiplying the annual commissions of the particular account by one and one-half. Petitioners, however, overlook a significant imperfection in their valuation process. While the one and one-half capitalization rate may be accurate enough for purposes of valuing an entire insurance business, it is too arbitrary to estimate the value of an individual account with reasonable accuracy. Additionally, such a procedure does not comport with the technique approved in *Commissioner* v. *Seaboard Finance Co., supra*, upon which petitioners base their position. In *Seaboard* there was evidence that the valuation process included a consideration of the quality of each account as well as the income it earned. In the instant case, however, there is nothing in the record to show that each account had a value comparable to the others based on its credit risks and the commissions it produced. Moreover, the rule-of-thumb method, which is readily acceptable for purposes of aggregate valuation, undoubtedly has even

---

[13] Petitioners have directed our attention to a case very recently decided by the Court of Appeals for the Ninth Circuit, *Securities-Intermountain, Inc.* v. *United States,* 460 F.2d 261 (C.A. 9, 1972), which they commend as a persuasive precedent for a decision in their favor in this case. We have read the opinion in that case with considerable care and are convinced that it is clearly distinguishable on the facts and is not controlling of our decision here. In that case, which involved the acquisition of a mortgage portfolio, the District Court found that the purchaser acquired no more than the right to receive income produced by servicing the outstanding mortgages in the portfolio and that there was no sale of "goodwill" involved. (The right to represent Aetna was nonassignable and the seller continued in the mortgage banking business in competition with the buyer, servicing mortgages for other lenders.) Here, we have found that goodwill was sold and that all of the intangible assets acquired were inseparable from the goodwill. Also, the seller did not continue in business in competition with the buyer. Furthermore, there are many differences in the insurance agency business and the business of servicing mortgage loans.

other risk factors built into it that would vary with each individual account. See *Hugh H. Hodges*, 50 T.C. 428, 443 (1968). The record therefore does not give us sufficient information to find that a portion of the purchase price is allocable to any one account. See *Manhattan Co. of Virginia, Inc.*, 50 T.C. 78 (1968); *Richard M. Boe*, 35 T.C. 720 (1961), affd. 307 F.2d 339 (C.A. 9, 1962); *Anchor Cleaning Service, Inc.*, 22 T.C. 1029 (1954).

Furthermore, the payment made for the intangibles of the partnership was for the right to utilize those assets to pick up and retain the customers' business. There was no guarantee that the customers would continue doing business with JBL&K. The courts have frequently held that such customer lists and similar items constitute a single capital asset, and as such continue to have value despite fluctuations and alterations. See *Richard M. Boe, supra*, and cases cited therein. JBL&K received and presumably utilized that for which it paid. When the customers failed to renew their policies with JBL&K it suffered a loss of business but not a deductible business loss.

With regard to the assets JBL&K acquired from Schmeer partnership, we hold that petitioners are not entitled to any deductions on the intangible property under section 165 or section 167.

SIAI presents an entirely different situation for our consideration. Here we are faced with a corporate insurance agency with only one large client. We think the evidence reasonably establishes the fact that the business had no insurance expirations or renewals of any significant value. The most valuable asset of SIAI was its loss experience record which was a prerequisite to taking over the bank's consumer finance business, and which several other agencies were eager to purchase. We believe that JBL&K agreed to purchase both businesses for the primary purpose of being able to take over the bank's consumer finance business, which it expected to continue for an indefinite time. This involved acquiring an entire indivisible mass of intangible assets which included the loss experience information, goodwill, customer lists, etc. SIAI's experience loss records simply permitted JBL&K to acquire the bank's business so it could build its own loss experience records and continue the business indefinitely. JBL&K paid the $168,571.66 as the price for acquiring the bank's consumer loan business, which had no determinable life. It would be unrealistic and unreasonable to say that any specific part of the $168,571.66 was paid for SIAI's loss experience information alone which would become obsolete in 5 years, and therefore can be written off in 5 years.

The documentary evidence lends support to this conclusion.

Subparagraph (a) of the SIAI sales contract specifically states that the $168,571.66 portion of the purchase price is to pay for "good will, customer accounts, lists, policies and renewals, licenses or franchises." Coincidentally, the corporation's books had a stated goodwill value of $55,000. We are not barred from looking beyond the sales instrument to see, in fact, if there really was SIAI goodwill transferred at the sale,[14] but upon such examination we find that JBL&K treated the $168,571.66 as the cost of SIAI insurance expirations on its books.

Additionally, there is other strong evidence that goodwill was purchased as part of the sale. SIAI's goodwill is clearly identifiable in the referral arrangement it had with the bank, which by necessity was tied to the loss experience information, and in Schmeer's contact with the insurance underwriter who insured the policies written on the bank's borrowers. Undoubtedly, then, Jewett, as negotiator for JBL&K, was making sure his firm got the benefit of the goodwill when he contacted the bank and the insurance underwriter about continuing the business of SIAI.

We will not attempt to solve the riddle why JBL&K allocated the $168,571.66 solely to SIAI expirations which it now argues are nonexistent. However, in assessing these discordant facts we have arrived at the conclusions that (1) there were no insurance expirations of any value in SIAI; (2) there was considerable goodwill in the business which was of significant value; (3) the sales contract made no allocation of $168,571.66 among the intangible assets obtained from SIAI, i.e., the goodwill and loss experience information, JBL&K made no allocation of that amount on its books, and no evidence was offered upon which such an allocation could be made.

Based on the record and our interpretation of the evidence we are compelled to uphold respondent's determination that the loss experience record was part of a large intangible mass asset. Furthermore, the mass asset is indivisible which means no definite value can be allocated to the loss experience record for purposes of computing depreciation, *Credit Bureau of Erie, Inc.*, 54 T.C. 726 (1970); *Manhattan Co. of Virginia, Inc.*, *supra*, or claiming a business loss deduction, *Richard M. Boe, supra.*

> *Decisions will be entered for the respondent except in docket No. 458–68.*
>
> *Decision will be entered under Rule 50 in docket No. 458–68.*

---

[14] See, for example, *John T. Fletcher, supra,* where we looked beyond the sales instruments to see what assets were included in the sale.